Barbara J. Schultz  (SBN 168766) bschultz@lafla.org
Paul J. Estuar (SBN 167764) pestuar@lafla.org
**LEGAL AID FOUNDATION OF LOS ANGELES**
1550 West Eighth St.
Los Angeles, CA 90017
Tel:    (213) 640-3823
Fax:    (213) 640-3802
Attorneys for Plaintiff CANGRESS

[Additional counsel listed on next page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CANGRESS, a non-profit corporation,
DEBORAH BURTON, an individual,

Plaintiffs,

vs.

CITY OF LOS ANGELES; LOS ANGELES
POLICE DEPARTMENT; CENTRAL CITY
EAST ASSOCIATION; DOWNTOWN
INDUSTRIAL DISTRICT BUSINESS
IMPROVEMENT DISTRICT; CHARLIE
BECK, in his official capacity; SHANNON
PAULSON, individually and in her official
capacity; ESTELA LOPEZ, as an individual
DOES 1 -10.

Defendants.

Case No.  CV 14-01743 SVW (MANx)

FIRST AMENDED COMPLAINT FOR
DECLARATORY,  INJUNCTIVE
RELIEF, AND DAMAGES

1. FREEDOM OF SPEECH AND
   ASSOCIATION (U.S.C. § 1983-14TH
   Amendment Retaliation)
2. DUE PROCESS (42 U.S.C. §1983-14TH
   Amendment)
3. RETALIATION (42 U.S.C. §1983– 1ST
   Amended Retaliation)
4. MALICIOUS PROSECUTION
   (42 U.S.C. § 1983)
5. MALICIOUS PROSECUTION
   (California State Law)
6. THREATS, INTIMIDATION OR
   COERCION (Civil Code § 52.1)
7. VIOLATION OF A MANDATORY
   DUTY (Gov. Code §815.6)
8. INTENTIONAL INFLICTION OF
   EMOTIONAL DISTRESS

1

[Additional Counsel]

Dan Stormer (SBN 101967) dstormer@hadsellstormer.com
Joshua Piovia-Scott (SBN 222364) jps@hadsellstormer.com
**HADSELL STORMER RICHARDSON& RENICK LLP**
128 N. Fair Oaks Ave., Suite 204
Tel:    (626) 381-9261
Fax:   (626) 577-7079
Attorneys for All Plaintiffs

John L. Raphling (SBN 169554) johnraphling@yahoo.com
**LAW OFFICE OF JOHN L. RAPHLING**
723 Ocean Front Walk
Venice, CA 90291
Tel:  (310) 450-8093
Fax: (310) 450-8490
Attorneys for All Plaintiffs

FIRST AMENDED COMPLAINT

Plaintiffs CANGRESS, aka Los Angeles Community Action Network ("LA CAN") and Deborah Burton, bring this Complaint for Damages, Declaratory, and Injunctive relief against the City of Los Angeles, the Los Angeles Police Department, the Central City East Association, the Downtown Industrial District Business Improvement District, Charlie Beck in his official capacity, Shannon Paulson , individually and in her official capacity, and Estela Lopez, individually. This court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §§1331, 1343 and 1367.

## PRELIMINARY STATEMENT

1.     LA CAN, a community organization representing poor people in Skid Row, and one of their organizers, Deborah Burton, bring this lawsuit to stop Defendants from unlawfully silencing their voices in the debate about the future of downtown Los Angeles.  Defendants have used a variety of illegal tactics to suppress LA CAN's First Amendment right to organize, protest, speak out and advocate.  These tactics include harassment, intimidation, threats of arrest, arrests, denial of access to public space and public meetings, and the malicious, fabricated prosecution of Ms. Burton for crimes she did not commit.  LA CAN and Ms. Burton ask the Court to enjoin defendants and seek compensation for harm done to them.

2.     Just a few blocks from the seats of government and judicial power in Los Angeles is Skid Row, the most intense concentration of homelessness and extreme poverty in the United States.  In its current form Skid Row, sometimes known as "Central City East," was the product of careful planning by the City of Los Angeles dating back to the 1970's aimed at containing the destitute and homeless and keeping them separated from areas to the west deemed worthy of development.  Over the past four decades, the numbers of extremely poor and homeless residents in Skid Row has increased dramatically, as has the proportion of non-white persons, particularly African American men.

FIRST AMENDED COMPLAINT

3.     Over the same period, however, the potential development value of Skid Row also rose dramatically, leading to intense pressure by developers and landlords to displace poor tenants and to force homeless people from the area, by means both legal and otherwise.   Many business interests and the City officials who support them apparently see the existence of high concentrations of poor people in the area, especially African-American men and the highly visible homeless population, as an obstacle to planned business expansion and development.  Those business interests are organized by the leaders of City-sanctioned "Business Improvement Districts," including defendant Downtown Industrial District Business Improvement District, operated by defendant Central City East Association.

4.     These business interests and City officials have devised a campaign to make Skid Row a hostile environment for the very poor and homeless, culminating with the 2006 launch of the "Safer Cities Initiative" or SCI.   SCI is undoubtedly the most concentrated and sustained use of police force in any neighborhood in America.   SCI officers do little to curb serious crime.  Instead, they stop, interrogate, question, cite and harass the poor, homeless, and non-white residents of Skid Row, and enforce so-called "quality of life" laws, which are generally ignored elsewhere in the City.

5.     Plaintiff LA CAN is a grassroots community organization that has advocated since 1999 for the rights of the people of Skid Row, including poor tenants, people of color and homeless people, against these efforts to displace them.  LA CAN is the only organization in Skid Row whose membership primarily lives in Skid Row and whose sole purpose is advocacy for those poor and homeless residents of Skid Row whose voices are otherwise unheard in the halls of power in the City.  LA CAN has consistently objected to SCI and protested its harmful effects on the Skid Row community.

6.     Defendant City and its police department, in collaboration with defendant Central City East Association and its leadership, have responded to LA CAN's

FIRST AMENDED COMPLAINT

advocacy by imposing an ongoing campaign of threats, harassment and intimidation to silence the one loud voice of Skid Row's poor and homeless.

7.      Plaintiffs bring this lawsuit to address defendants' wrongful and illegal conduct in targeting LA CAN, its staff and members by continually violating their civil rights in an attempt to shut them up. Defendants have harassed, intimidated, arrested, and wrongfully prosecuted plaintiffs, in order to remove community opposition to the Safer Cities Initiative and other policies that criminalize poor people. Defendants' actions have diverted LA CAN's resources and frustrated their mission by interfering with its ability to advocate for the preservation of housing and for additional resources for the Skid Row community, to promote healthy living and nutrition, to educate the community about their rights, to advocate for community safety, and to help assert their basic civil and human rights.  In addition, defendants' malicious prosecution and conspiracy against plaintiff Deborah Burton has caused her both physical and emotional injury.

8.      Defendants City of Los Angeles, Los Angeles Police Department ("LAPD"), Chief Charlie Beck and Lieutenant Shannon Paulson have violated plaintiffs' First Amendment rights by engaging in intimidation tactics such as placing LA CAN under surveillance, blocking LA CAN from videotaping police activity, wrongfully detaining and arresting LA CAN staff and members, threatening arrest for protected First Amendment activity, publicly and falsely denigrating LA CAN, targeting LA CAN staff and members at LAPD roll calls and through emails, and maliciously prosecuting Deborah Burton for crimes she did not commit as an effort to punish her for speaking out and to silence the entire organization.

9.      Defendants Central City East Association, led at all relevant times by defendant Estela Lopez, conspired with City and LAPD, particularly Lt. Shannon Paulson, to deprive plaintiffs of their civil rights by strategizing with LAPD and the City Attorney's office to the target LA CAN by falsely accusing Deborah Burton of

FIRST AMENDED COMPLAINT

criminal activity. Defendants Central City East Association, Lopez and Paulson worked together to formulate a strategy to prosecute Ms. Burton and silence LA CAN, including editing police reports to distort facts against LA CAN, having Lopez volunteer to be a purported victim, aid in a bogus investigations and promote the untrue accusations in the media.

## JURISDICTION AND VENUE

10.   Plaintiffs bring this action for declaratory relief, injunctive relief and damages under 42 U.S.C. §1983 and California Civil Code §52.1.

11.   This Court has jurisdiction under 28 U.S.C. §§1331, 1343 and 1367, including supplemental jurisdiction over the state law causes of action because they form part of the same case or controversy as the federal law claims.

12.   The acts and omissions complained of herein took place within the Central District of California. Defendants reside in the Central District. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## PARTIES

13.   Plaintiff CANGRESS doing business as Los Angeles Community Action Network ("LA CAN"), is a California non-profit corporation exempt from taxation under section 501(c)(3) of the Internal Revenue Code, and has its principal place of business in the City and County of Los Angeles.

14.   Plaintiff Deborah Burton ("Burton") is, and at all times herein alleged, has resided in the City and County of Los Angeles, in the jurisdiction of the State of California. Plaintiff Burton is a sixty-two year old African-American woman who is an organizer working for LA CAN.

15.   Defendant City of Los Angeles ("City") is, and at all times herein alleged was, a municipal corporation or political subdivision organized and existing under the laws of the State of California.

FIRST AMENDED COMPLAINT

16.    Defendant Los Angeles Police Department ("LAPD") is, and at all times herein alleged was, an agency of the City of Los Angeles.

17.    Defendant Central City East Association, Inc. ("CCEA") is, and at all times herein alleged was, a non-profit business corporation exempt from taxation under section 501(c)(6) of the Internal Revenue Code, and has its principal place of business in the City and County of Los Angeles. CCEA's purports to represent the interests of 1,500 business and property owners in Central City East neighborhood. All references to "CCEA" throughout this complaint also include the Downtown Industrial District Business Improvement District.

18.    The Downtown Industrial District Business Improvement District ("BID") is a quasi-governmental agency, financed through a special assessment upon real estate properties that receive special benefits from the improvements and activities and are sanctioned and created by the City pursuant to Streets & Highways Code §36501. The BID is administered through CCEA.

19.    Defendant Estela Lopez ("Lopez") was the executive director of CCEA and the BID at all times relevant in this complaint and is sued in her individual capacity.

20.    Defendant Chief Charlie Beck ("Beck") is the Chief of the LAPD and is sued in his official capacity.

21.    Defendant Lt. Shannon Paulson ("Paulson") is an officer with LAPD and is sued in her official and individual capacities. She was the commanding officer of the SCI deployment at all relevant times in this complaint.

22.    The true names and capacities of defendants DOES 1 through 10, inclusive, are presently unknown to plaintiffs who therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to set forth the true names and capacities of said defendants when such has been ascertained. Plaintiffs are further informed and believe, and thereon allege, that each of the fictitiously named defendants aided and assisted the named defendants in committing the wrongful acts alleged

FIRST AMENDED COMPLAINT

herein, and that any damages they have sustained, as alleged herein, were proximately caused by such defendants.

23.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the defendants was the agent and/or employee and/or co-conspirator of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of the other co-defendants.

24.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the defendants acted as joint actors with joint obligations, and that each defendant was and is responsible for the conduct and injuries alleged herein.

## FACTUAL ALLEGATIONS

### History of Skid Row

25.     Skid Row is a geographical area containing approximately fifty city blocks immediately east of downtown Los Angeles.   Nearly all of the approximately 14,000 people who live in the Skid Row area are extremely low income. The majority are African-American.  About two-thirds of Skid Row residents live in residential hotels. The remaining one-third are homeless.[1]  49.3% of homeless people in the City of Los Angeles are African-American and 24.4% are Latino.[2]

26.     The City created Skid Row in its current form by implementing a policy of "containment"[3] of the extremely poor and homeless in the City.  This containment

---

[1]  Los Angeles Homeless Services Authority, (LAHSA), 2011 Greater Los Angeles Homeless Count, available at http://documents.lahsa.org/planning/homelesscount/2011/HC11-detailed-geography-report.PDF, at p. 37.

[2] Los Angeles Homeless Services Authority, (LAHSA), 2011 Greater Los Angeles Homeless Count, available at http://documents.lahsa.org/planning/homelesscount/2011/HC11-detailed-geography-report.PDF p. 23.

[3] Los Angeles Community Design Center, *Skid Row: Recommendations to Citizens Advisory Committee on the Central Business District Plan for the City of Los Angeles, Part 4: Physical Containment* (1976).

FIRST AMENDED COMPLAINT

1  policy concentrated homeless services and residential hotels in Skid Row, and

2  effectively excluded such services and housing elsewhere, particularly South Central

3  Los Angeles, which had a very high proportion of extremely poor and homeless

4  individuals. Forced by hunger and other basic needs to leave their own neighborhoods,

5  many sought refuge on Skid Row. There was little opposition to this containment policy

6  until business owners, who had been attracted to the area by cheap rents, organized and

7  began advocating police sweeps of homeless encampments in the mid-1980s.[4]

8      27.    In 1998, defendant CCEA formed a Business Improvement District in Skid

9  Row. The purpose of Business Improvement Districts is to provide services "above and

10  beyond" those provided by the City. [5] The BID on Skid Row deployed a private security

11  force, serving the business owners that patrol the public streets and sidewalks, often

12  contacting and harassing poor and homeless people.

13      28.    In 2002, Defendant City of Los Angeles approved the City Center

14  Redevelopment Plan in the downtown area with the purpose of "minimize[ing] the

15  overconcentration or exclusive concentration of such services within the Project Area."

16  The Community Redevelopment Agency's report to the City Council regarding the plan

17  estimated that it would result in the destruction of 4,178 units of affordable housing.

18  Notably, the plan included no provisions for services in other areas that might meet the

19  needs of the desperately poor and homeless in other areas lacking such an

20  "overconcentration."

21

22

23  _____

24  [4] See, e.g., Frank Clifford and Penelope McMillan, *Raids Meant to Rid Skid Row of Its Homeless Encampments*, Los Angeles Times, p.1, February 19, 1987 (quoting the City's Community Redevelopment Agency President , James Wood , as saying that "the impetus for the [police sweep of homeless encampments] came from Central City East, a business group representing about 40 companies on Skid Row that for two years have been urging City Hall to take more aggressive action against crime and to clean up the area."

25

26

27  [5] "BIDS 101" at http://clerk.lacity.org/BusinessImprovementDistricts/index.htm

28

FIRST AMENDED COMPLAINT

29.    On September 24, 2006, then City Mayor Antonio Villaraigosa announced the public launch of SCI on Skid Row. City officials claimed that there were to be two main features of SCI:  the unprecedented "deployment of 50 more police officers to Skid Row," and funding for programs "...leading those who need help to housing and services."[6]    The police presence arrived immediately; the funding for programs for housing and services never materialized. In the first year alone, in an area with 14,000 residents, SCI officers issued approximately 10,000 citations to Skid Row residents. The vast majority of citations were for so-called "quality of life" offenses, including cross-walk violations, littering (despite the fact that defendants City and CCEA refused to provide trash cans), and sitting, lying or resting possessions on the sidewalk, despite the fact that thousands of Skid Row residents had no other choice.

**History of LA CAN**

30.    LA CAN was established in 1999, to give voice to the extremely low income people living in residential hotels and on the streets of Skid Row. LA CAN has two co-executive directors, five full time organizers, three part time staff and several interns. LA CAN has more than 800 members, approximately 300 of whom are regularly involved and, of those, about 75 who are active "core" members. LA CAN's multiracial membership reflects the community's diversity.  65 percent are African American and 25 percent Latino. 75 percent are extremely low-income tenants, living in residential hotels, subsidized or public housing.  Many are currently or formerly homeless.

31.    In 2002, LA CAN organized in opposition to the City Center Redevelopment Plan including participating in a lawsuit.[7]  Negotiations led to a

---

[6] Office of the Mayor Press Release, "City Launches Initiative to Reduce Crime on Skid Row; 50 More Police Officers Deployed to Area" September 24, 2006.
[7] Wiggins v. Board of Directors of the Community Redevelopment Agency, et.al., BC 276472 r/t 277539

policy that protected all existing affordable housing in the downtown area, specifically preserving approximately 8,500 units of residential hotels.[8]

32.    In 2004 LA CAN, Legal Aid Foundation of Los Angeles, and UCLA El Centro Legal formed a weekly legal clinic that exposed patterns of illegal practices by residential hotel owners and civil rights violations by business improvement district guards and LAPD.  LA CAN has organized to address these problems.

33.    In November 2005, LA CAN launched the Community Watch program. As part of Community Watch, LA CAN trains and deploys staff and members to patrol the community in teams and document police and private security actions in order to prevent or at least expose civil and human rights violations in the community. Initially Community Watch was formed in reaction to community concerns about business improvement district private security guards' treatment of residents in public spaces over which they had no more legal authority than any other private person. When the City launched the so-called SCI in Skid Row, people in the community began reporting abuses by LAPD in addition to the problems they'd already had with the private guards. Community Watch began monitoring the activities of LAPD officers, which were often in close collaboration with private guards, including defendant BID.   In addition to monitoring LAPD officers through Community Watch, LA CAN has organized and advocated to curtail their abuses, through public protests, speaking out at community meetings, City Council hearings, Police Commission meetings and through the media.

34.    From 2004 to the present LA CAN has successfully organized to stop unlawful practices aimed at forcing poor tenants out of their residential hotel rooms to make space for those able to pay more.  These practices have included, "the 28 day shuffle," in which tenants are moved from unit to unit every 28 days in an effort to keep them from acquiring the rights of permanent tenants, the imposition of unlawful guest

---

[8] *Id.*

fees, maintenance of slum housing conditions, violations of California's redevelopment laws, racial and other discrimination and forced eviction and displacement. LA CAN has worked closely with past City Attorneys and other public officials to solve these problems. LA CAN also organized to pass the citywide Residential Hotel Ordinance, which regulates and prevents the demolition and conversion of about 16,000 residential hotel units in Los Angeles.  LA CAN works on voter registration drives, violence prevention, and food justice issues. LA CAN has produced several community research and academic studies, including:  four Downtown Women's Needs Assessments[9], a Human Rights Assessment of the Safer Cities Initiative[10], and a participatory action research project focused on public health issues titled The Dirty Divide.[11] These are among the kinds of activities from which the unconstitutional and unlawful efforts of defendants have diverted LA CAN's organizational and financial resources.

## LAPD'S INTERFERENCE WITH LA CAN

35.    Defendant LAPD has a long history of interfering with LA CAN's community engagement activities, particularly the Community Watch program and other First Amendment expressive activities. LAPD routinely targets LA CAN staff and members by detaining, arresting, threatening arrest, harassing and intimidating, denying

---

[9] "Downtown Women's Needs Assessment: Findings and Recommendations (2001)," http://cangress.org/wp-content/uploads/2013/04/2001needsassessment.pdf;
"Many Struggles, Few Options: Finding and Recommendations from the 2004 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/2013/04/2004needsassessment.pdf;
"Growing Need and Shrinking Opportunities: Finding and Recommendations from the 2007 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/2013/04/2007needsassessment.pdf;
"2010 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/2013/03/DWAC_NeedsAssessment2010.pdf.
[10] "Community-Based Human Rights Assessment: Skid Row's Safer Cities Initiative," http://cangress.org/wp-content/uploads/2012/11/sci-2010-report-final1.pdf.
[11] "The Dirty Divide in Downtown Los Angeles: A Call for Public Health Equality," http://cangress.org/wp-content/uploads/2012/11/Dirty-Divide-Complete-April-2013.pdf.

FIRST AMENDED COMPLAINT

1    access to public spaces and public meetings, surveilling, and instigating baseless

2    prosecutions.  LAPD's intentional targeting of LA CAN has harmed LA CAN's ability

3    to fulfill its mission, recruit new members, and gain funding.

4          **A.**    **LAPD's interference with Community Watch**

5         36.      From the inception of Community Watch, LAPD interfered with team

6    members' ability to document police interaction with residents. LAPD officers order

7    Community Watch team members, and only Community Watch team members, to

8    move away from positions on public sidewalks from which LAPD's interactions with

9    residents of Skid Row could be observed and video-recorded. Officers frequently block

10   team member's cameras with their hands and bodies. Officers have pushed, impeded,

11   harassed, threatened with arrest, and on a few occasions detained team members for

12   asserting their right to witness and film police activity from a safe distance, in places

13   where other people are allowed to observe.

14        37.      On or about September 9, 2008, LAPD officers arrested plaintiff Burton

15   near the intersection of Sixth and Maple Streets while she was on Community Watch.

16   Ms. Burton, wearing an LA CAN t-shirt and writing on a clipboard, was watching

17   officers talking to a community resident. An officer told her to back up.  She complied

18   with the orders.  Then the officer demanded that she leave the sidewalk altogether and

19   go across the street, though others were allowed to use that same sidewalk. When she

20   did not cross the street the officer had her handcuffed, placed in a patrol car, and,

21   eventually taken to Central Division station, where officers questioned her about

22   personal information, what "gang" she was affiliated with, and whether she had tattoos.

23   Eventually they released her without charges.  Her arrest prevented her from

24   participating in Community Watch that day, and caused her and her team, as well as

25   other LA CAN members and staff, great fear and anxiety.

26        38.      Plaintiffs are informed and believe that during arrests in which

27   Community Watch team members are observing and videotaping, LAPD officers tell

28

FIRST AMENDED COMPLAINT

1  arrestees to request that LA CAN turn off their cameras and threaten harsher treatment

2  to those who do not make the request.

3    **B.    LAPD Interference with Other LA CAN Community Engagement**

4          **Activities**

5    39.        During the summer of 2007, an LAPD patrol car routinely parked

6  directly in front of LA CAN's office for a half hour every morning. Officers sat in the

7  car and watched LA CAN's staff, members and guests come in and out. Plaintiffs are

8  informed and believe that the sole purpose of this LAPD activity was to intimidate LA

9  CAN staff and members.

10   40.        On April 7, 2010, then City Attorney Carmen Trutanich held a press

11 conference in Gladys Park within the Skid Row community to announce the filing of an

12 injunction against people identified by the police as drug dealers. The injunction named

13 approximately eighty people, but also applied to up to 300 more people, identified only

14 as "John Does." LA CAN and others attended the press conference to protest the

15 injunction, understanding that it would be used as a tool of racial profiling and

16 criminalization of poor people. Mr. Trutanich disparaged LA CAN and its members,

17 accusing them during his public statement of supporting and possibly being "drug

18 dealers." One published blog post quoted Mr. Trutanich as saying in reference to the

19 LA CAN protesters, "You have to wonder if the people behind me are not in cahoots

20 with the people providing the narcotics to the area."[12]

21   **C. Publication of anti-LA CAN material by LAPD**

22   41.        During all relevant times herein, Officer Deon Joseph was LAPD's

23 designated Senior Lead Officer for the Skid Row neighborhood. One of the primary job

24

25

26

27 [12] http://blogdowntown.com/2010/04/5249-injunction-sought-by-city-attorney-to-curb

28

FIRST AMENDED COMPLAINT

1  duties of senior lead officers is to act as a liaison with the community and "provide a
2  link that helps unite the LAPD with the communities it serves."[13]

3      42.      In or about 2007, Joseph, as part of his official duties as Senior Lead
4  Officer, began posting entries on the LAPD's publicly-posted blog (www.lapdblog.org),
5  as well as distributing printed handouts targeting and demeaning LA CAN and
6  highlighting the animus of the LAPD towards LA CAN's exercise of its First
7  Amendment rights.

8      43.      In a March 2, 2007 LAPD blog entry entitled "Action vs. Activism,"
9  Joseph claimed LA CAN fed the public "perverted versions" of the truth. Joseph wrote
10  that the "activist group" "[did] not care how many people get stabbed, overdose, or
11  robbed on skid row," or "how many officers' good names they smear, or how long they
12  stymie the system, as long as in the end they get what they what [sic] they want." He
13  claimed that the group empowered the criminal element to see their lawless behavior as
14  a "civil right." Joseph attempted to portray LA CAN as an enabler and fomenter of
15  unlawful activity in the Skid Row neighborhood in order to appeal for more money
16  from their funders.

17      44.      In a subsequent blog post dated September 7, 2007, entitled "Are They
18  Really For You?", Officer Joseph's attacks on LA CAN took a more  sinister  tone. In
19  complete derogation of the truth, Joseph wrote in LAPD's official blog  that LA CAN
20  exploited poverty for funding, its' members sold  knives and cans of beer to homeless
21  people, and distributed pornography on the sidewalks where women and children walk
22  He denigrated the organization's filing of officer complaints as often "false" and as
23  "slander" against LAPD leadership.   He closed by calling his false accusations against
24  LA CAN "truths", and his blog entry as a "letter of truth".  He signed off the blog entry
25  as "From your SLO Deon Joseph, Serial No. 32511."

26

27  [13] http://www.lapdonline.org/faqs/content_basic_view/9664

28

FIRST AMENDED COMPLAINT

45.    Officer Joseph took the polemic one step further by personally, in uniform, distributing a printed, and more vitriolic, version of his blog entry to Skid Row residents, entitled "Are They Really For You?". The handout accused LA CAN and its members of "pimping poverty for funding" and "poisoning the community". He wrote that, "It angers me that this group truly wants skid row to go right back to where it was before, with people overdosing and slowly dying on the sidewalks, so they can pimp your pain to the Catholic Church, and other donors, without seeing one bit of improvement in your lives." He signed off the handout as "From your Senior Lead Officer Deon Joseph. God Bless and keep you all."

46.    LA CAN filed an LAPD misconduct complaint about the blog posts and handouts, which eventually was successful in stopping the handouts. However, they were never formally retracted, and a slightly altered blog post version of "Are They Really For You?" remains on the LAPD blog site to this day.

47.    In addition to his written communications, Officer Joseph has repeatedly interfered with private tours conducted by LA CAN. LA CAN organizers often show groups of students, church members, and donors the Skid Row community. During several of these tours, Officer Joseph, acting in his official capacity as LAPD liaison to the community, has accosted the groups being led by LA CAN staff to say that LA CAN is spreading lies about Skid Row. Officer Joseph often uses the loud speaker on his police car to make derogatory comments about LA CAN, when he sees LA CAN organizers speaking to people in the community or participating in Community Watch. This activity is plainly intended to interfere with  LA CAN's ability to recruit members and raise much needed funds

**D.  Other Arrests and Detentions**

48.    In or about 2007 Co-Executive Directors Pete White and Becky Dennison, along with staff member Steve Diaz, heard that business improvement guards were beating a man on a public sidewalk. They went to film the incident and to demand

1   that the beating stop. Dennison and White's efforts were limited entirely to speaking to

2   the private security guards.   LAPD never arrived on scene, and the guards eventually

3   stopped beating the man, who then ran away. Approximately two days later, LAPD

4   officers came to the LA CAN office and demanded to see Becky Dennison's

5   identification. The officers told her that they were investigating an alleged assault by an

6   LA CAN member against a business improvement district guard.  Ms. Dennison and

7   Mr. White discussed the incident briefly with the officer and explained what happened.

8   Later, Mr. White and Ms. Dennison each received a letter from the City Attorney's

9   office accusing them of committing a battery and demanding that they appear at a City

10   Attorney's hearing.  After the hearing no charges were filed.

11        49.     LAPD has particularly targeted General Dogon, the LA CAN staff

12   member who started the Community Watch program. Dogon joined LA CAN in early

13   2005 after witnessing a guard violently twist the arm of a woman who the officer

14   suspected had a crack pipe.  The "crack pipe" was in fact only eyeliner.  Because of his

15   Community Watch activity, Dogon is known by many LAPD officers, who harass him

16   both during and after work hours, as he is a Skid Row resident. Police have detained

17   Dogon approximately five times without any charges being filed. An example of one

18   incident was in approximately March, 2009. Dogon left the office to get something

19   from his nearby apartment. A police car with two officers focused a spotlight on him.

20   They got out of the car and one said his name, and told him to get up against the wall.

21   They told him to turn around so they could search him.  Dogon asked that a supervisor

22   be called and said that he did not consent to a search, as the officers who stopped him

23   had no reasonable cause for doing so. Shortly thereafter, about a dozen more officers

24   arrived on the scene. Someone had alerted other LA CAN members about the detention

25   and they came out to observe. They realized Main Street had been closed to traffic

26   because of the detention of this one LA CAN staff member and LA CAN observers

27

28

1  were held about half a block away. Dogon was detained for approximately half an hour

2  and then released.

3      50.    Because of the ongoing targeting of Dogon, in 2010 LA CAN and the

4  National Economic and Social Rights Initiative filed an Urgent Appeal to the United

5  Nations' Special Rapporteur on the situation of human rights defenders, and an updated

6  version of the Urgent Appeal was filed in 2011 upon request.  The UN review resulted

7  in a letter of concern issued to the U.S. Government that requested a reply to the

8  allegations within 60 days (Case No. USA 24/2011). As of the June 2012 report to the

9  UN Human Rights Council, no reply was received.

10     51.    On or about April 2, 2013, LAPD officers arrested LA CAN member

11 Wayne Henderson solely because he was videotaping the arrest of an LA CAN member

12 outside LA CAN's office. Mr. Henderson obeyed several orders by police to move

13 back, but they still arrested him, claiming he was interfering with the arrest.  No charges

14 were filed.  During this arrest, General Dogon opened up LA CAN's office space so

15 that other observers on the sidewalk could go inside to avoid being arrested.  Two

16 LAPD officers, including, on information and belief, Sergeant Kenny, followed Dogon

17 and the others inside LA CAN's office. The officers stood near the doorway, one with

18 his hand on his gun, in such a way as to convey to those inside that they were not free to

19 leave. Although they were on LA CAN's private property without probable cause and

20 over the objections of LA CAN staff, the officers refused to leave, claiming they were

21 coming in to "go to the meeting." Only after numerous requests that they leave and after

22 and a substantial delay did they do so.

23     52.    On or about May 22, 2013, LA CAN and supporters held a protest in

24 front of LAPD headquarters about the wrongful prosecution of LA CAN staff member

25 Deborah Burton.  LA CAN members and supporters intended to also speak against this

26 prosecution in a public meeting of the Police Commission as part of the Commission's

27 standard procedures for hearing from the public.  However, after only a few

28

1    participants entered the Police Commission hearing room, LAPD officers barred other

2    LA CAN members and supporters from attending this public meeting.  No one other

3    than LA CAN members was excluded.  LAPD officers claimed that there was no more

4    room in the hearing room, though there were many seats available.

5         53.      After the Police Commission hearing, the same group of LACAN

6    members and supporters went to City Hall East, which houses the offices of the City

7    Attorney of the City of Los Angeles and is generally open to the public. A small

8    delegation sought to speak to a representative from the City Attorney's office, but were

9    denied access to the lobby of City Hall East by approximately one dozen armed police

10   officers.

11        54.      After leaving City Hall East on May 22, 2013, LA CAN members and

12   supporters returned to the LA CAN offices on Main Street to resume their planned

13   activities, which included distributing vegetable seedlings to Skid Row residents as a

14   part of LA CAN's Healthy Food Project. Two LA CAN member-interns and another

15   LA CAN volunteer were sitting on folding chairs with their backs to the wall of the LA

16   CAN office building, passing out seedlings to Skid Row residents and educating people

17   about growing and eating healthy foods.  There were numerous other individuals,

18   unrelated to LA CAN, sitting on the sidewalk nearby. Several LAPD officers arrived

19   and, without warning, detained the three LA CAN members. When bystanders asked

20   the officers why the three were being detained, the officers called for back-up.   Shortly

21   thereafter, the LAPD Watch Commander and approximately ten other LAPD officers

22   arrived on the scene.  One of the interns and the one volunteer were cited for sitting on

23   the sidewalk.  None of the non-LA CAN people who had also been sitting on the

24   sidewalk nearby were cited.

25        55.      LA CAN staff member Thelmy Perez went outside to document these

26   detentions with her cell phone camera.  As she was walking around the officers, LAPD

27   officers arrested her. They claimed she was blocking the sidewalk, which she was not.

28

FIRST AMENDED COMPLAINT

At the LAPD Central Bureau station, a female LAPD officer patted Ms. Perez down, lifting her breasts and placing her hands between her legs and buttocks while male officers looked on and mocked the pronunciation of her name, making comments such as "tell-me, you want to go to jail?" Police drove Ms. Perez to LAPD's 77th Street Division station, more than seven miles away. Ms. Perez repeatedly asked for the officers to adjust her handcuffs as they were very tight and causing her pain, and requested that they roll down her window as it was extremely hot in the back seat. Officers ignored her requests. When they arrived at the station Ms. Perez was soaked in sweat and her wrists and arm were in pain. Ms. Perez was released from 77th Station. No charges were filed against her. Ms. Perez suffered physical pain, humiliation and extreme anxiety. This arrest also interfered with her work as an LA CAN staff person and prevented her from witnessing and documenting police activity.

### E. Attack on LA CAN Members at City Hall

56.     On or about May 21, 2010, LA CAN members attended a Los Angeles City Council meeting at which a vote was scheduled to be held regarding a temporary rent-freeze for rent controlled apartments in the city. Members of at least ten other organizations attended the meeting. After several hours of waiting in very full council chambers, the large group of concerned residents were told that the City Council decided to send the motion back to committee and that there would be no public input. A spontaneous protest began. A large group of tenant advocates chanted "rent strike now". The Los Angeles General Services police officers, who are routinely at City Council meetings, started moving people out of the council chambers. People were slowly complying with the orders to leave. Approximately ten minutes after the protest began; about twenty armed LAPD Central Division police officers entered the chambers and surrounded the area where people were trying to exit. They funneled everyone into the crowded central aisle and started physically pushing people backwards, not allowing time or space for people to safely get to the exit. Members of the public were knocked

FIRST AMENDED COMPLAINT

1  down, and some were trampled, as LAPD officers continued pushing. LAPD then

2  closed the doors of chambers, sealing approximately fifteen people inside the council

3  chambers.

4      57.    Several LAPD officers tackled two LA CAN members, who were wearing

5  LA CAN t-shirts, they had sealed inside the council chambers. Without provocation,

6  LAPD officers used a taser on one of them, Gerardo Gomez, to apply a painful high

7  voltage electric shock. The officers arrested Mr. Gomez and held him in custody for

8  three days before he was released from the courthouse with no charges being filed.

9  Another LA CAN member's foot was trampled during the LAPD melee, and he

10  ultimately lost one of his toes as a result.  Mr. Gomez and several other LA CAN

11  members who were injured by police officers in this incident filed a lawsuit against the

12  City, which paid to settle the cases.  Mr. Gomez and some other LA CAN members

13  stopped going to City Hall for up to a year after this event due to extreme fear and

14  anxiety.

15      **F. Unlawful Limitations on First Amendment Activities in Protests and**

16         **Excessive LAPD Presence**

17      58.    In December, 2011, LA CAN and other tenant groups organized a three-

18  day clean up and camp out, called "Reclaim Rampart," at the notorious Rampart Police

19  Station. The purpose was to support the community's calls for the station to be re-

20  dedicated for a community oriented purpose.  After cleaning up the area, they gave

21  away fruits and vegetables, held conversations with residents about what the uses they

22  would most like for the site, and held community education events. On the first night of

23  the event, about twenty people, including several children, were camping on a

24  residential street in back of the old station. LAPD officers appeared and told

25  demonstrators to move to the Temple side of the building.  The group complied. A few

26  hours later, LAPD amassed dozens of officers in riot gear near the Rampart station.

27  LAPD shut down the 101 freeway exit and the street leading to Temple. LAPD

28

FIRST AMENDED COMPLAINT

Assistant Chief Perez told the group that they must remove all bedrolls and tents, and that no one would be allowed to sleep on the sidewalk near the station at any time. This order deliberately violated the settlement agreement to which the City had entered in *Jones v. City of Los Angeles*, 505 F.3d 1006 (9th Cir. 2007) (referencing the settlement) that permits people to sleep on sidewalks during nighttime hours.[14] Chief Perez threatened arrest of anyone sleeping, thus forcing the people to remain awake throughout the night. Many neighborhood residents expressed fear due to the large police presence. LA CAN members were extremely anxious for the same reason.

59.     In February 2012, Defendant City started street and sidewalk clean-ups in Skid Row. LA CAN supported these clean-ups, but opposed using them to take people's property. LA CAN members were present to help homeless individuals move back to their spots on the street after the cleaning and to monitor the handling of personal property. About a dozen LAPD officers refused to let people move their belongings back on the sidewalk on Towne Street after it was "sanitized." In a five minute period, a police officer threatened arrest of LA CAN members for being on the sidewalk, keeping personal property stationary (although it was in rolling carts), inciting the crowd, and not keeping moving. LA CAN members had to form a moving picket line with carts of personal property.

60.     In late May and June 2012, LA CAN began a series of protests against the Central City Association's "Downtown 2020" plan, because it promoted the criminalization of homelessness and policies that would limit or prevent the building of housing for the poor in the downtown area. As part of a larger community education

---

[14] In *Jones*, six homeless individuals filed an Eighth Amendment challenge to the enforcement of a City of Los Angeles ordinance that criminalizes sitting, lying, or sleeping on public streets and sidewalks. Plaintiffs were cited or arrested for violating the ordinance when they were unable to obtain shelter for the night. *Jones v. City of Los Angeles*, 444 F.3d 1118, 1120 (9th Cir. 2006) (opinion later vacated on the parties' motion after settlement of the case).The Ninth Circuit held, *inter alia*, that the ordinance violated the Eighth Amendment. *Id.* at 1138.

FIRST AMENDED COMPLAINT

1   strategy, LA CAN organized a weeklong "sleep-out" in front of the Central City

2   Association offices.  There were dozens of LAPD police officers regularly on site

3   throughout the several days of protests and "sleep-out,"  and at multiple early morning

4   protests in the weeks that followed.   LAPD officers told LA CAN staff and members

5   that they must remove their tents and signs. After LAPD confiscated a tent with protest

6   signs on it, LA CAN members lifted the tents up off the sidewalk and carried them. An

7   LAPD officer then informed LA CAN that they needed to "pack up and go" because

8   they were a public nuisance, and threatened arrest. LAPD officers ordered LA CAN

9   members to remove a canopy and table holding community education materials. An

10  LAPD officer stated that LA CAN members had one minute to remove all merchandise,

11  personal property, and "cardboard" (protest signs) from the public sidewalk or it would

12  be considered "found property" and confiscated. An LAPD officer then announced they

13  would be commencing street cleaning where the protest was taking place, whereupon a

14  business improvement district guard sprayed water on people who were peacefully

15  picketing.  LAPD officers also threatened, arrested or cited numerous protestors for

16  sitting on the sidewalk or for such things as placing a backpack on the sidewalk next to

17  them.

18       61.     In mid June, 2012, LA CAN members were on site at the Defendant

19  City's "clean up" of Gladys Street and Crocker Streets in Skid Row.  LA CAN had

20  asked for and received permission from LAPD Assistant Chief Paysinger and the Los

21  Angeles Fire Department official in charge to monitor the clean up. However,  LAPD

22  officers told LA CAN members that they could not be on the street and sidewalk even

23  though videos show other members of the public (and press) were on the street and

24  sidewalk for the same purposes, to observe the effort, including  how the personal

25  property of homeless individuals was being handled by employees of the defendant

26  City. LAPD officers threatened LA CAN members with arrest if they didn't monitor

27

28

FIRST AMENDED COMPLAINT

1  from a distance further away than members of the press and general public who were

2  observing.

3        62.     Over three weeks in November, 2012, the Central City Association held

4  three "Breakfasts with the Mayoral Candidates" at the Orpheum Hotel. LA CAN

5  protested the events to call for more housing for the poor and to let the mayoral

6  candidates that the Central City Association's plan for Downtown did not represent the

7  views or interests of all downtown residents and stakeholders. LAPD's presence grew

8  significantly each week. By the third and last week, LAPD officers were on the scene

9  even before LA CAN even arrived.  An LAPD officer informed LA CAN members that

10  they could not play drums or make other loud noise, and would be arrested if they did

11  so. LA CAN members put away drums and began singing and chanting quietly. LAPD

12  officers then ordered LA CAN members to be silent or suffer arrest for making

13  excessive noise.

14        63.     The multiple incidents described herein have had a severe and negative

15  impact on LA CAN's abilities to fulfill its mission. LA CAN has lost a number of

16  productive members due to fear of continued police harassment and unprovoked arrests.

17  One is an elderly woman who on multiple times was harassed by Officer Joseph and

18  told not to show up at LA CAN or participate in its activities. Another core member was

19  too afraid to go to City Council to petition government for two years after the May,

20  2010 incident. Others will not exercise their First Amendment rights by participating in

21  protests because of the large LAPD presence and aggressive conduct of its officers at

22  any LA CAN event. Many LA CAN members go about their duties, including

23  Community Watch, with apprehension and fear solely as the result of LAPD's unlawful

24  targeting.

25  //

26  //

27

28

FIRST AMENDED COMPLAINT

## CCEA Skid Row Walks and the Malicious Prosecution of
## Deborah Burton and LA CAN by all Defendants

64.     In July, 2012, the City Attorney filed criminal charges against plaintiff Deborah Burton, alleging several counts of assault based on events at a protest from over a year earlier. In July, 2013, a jury found Ms. Burton not guilty on all counts. In fact, there was no truth to any of the accusations, which were made by defendants. In the course of litigating this case, evidence emerged that showed the degree to which defendants were conspiring to target LA CAN, its staff, and members.

65.     In 2005, defendants CCEA, Estela Lopez, LAPD officials, along with Council staff, began an event called the Skid Row Walk ("Walk"). Each month, Ms. Lopez would lead a group of people for a walk around the Skid Row neighborhood, pointing out things that she and her organization perceived to be problems and discussing their proposed solutions to these problems. While the meeting was promoted as being open to the public, the viewpoints of homeless and low-income members of the community were rarely, if ever, included. Participants in the Walk usually were business leaders and real estate developers, politicians and government officials, wealthy residents of the area, and representatives from the large institutional homeless shelters. LAPD officers almost always participated in the Walk in large numbers. Defendant BID guards always accompanied the Walk.

66.     Plaintiffs are informed and believe that the real purpose of the Walk was to promote defendants Lopez and CCEA's' anti-homeless agenda, including removing poor and homeless people from Skid Row. One major goal of the Walk was to mobilize support for the Safer Cities Initiative. LAPD officers involved in SCI, particularly defendant Paulson, were active participants in the Walk.

67.     Starting on March 2, 2011, LA CAN and other community groups began countering the Walk to protest its gentrification and criminalization agenda. LA CAN and its partners believed that it was important to give voice to the portion the

FIRST AMENDED COMPLAINT

1   community that was excluded from the Walk, and that they needed to express to the

2   supporters and implementers of SCI the reality of its harmful impacts.  LA CAN and its

3   allies attended the Walks with signs critical of SCI, CCEA, the police, the Mayor and

4   City government.  They sang and chanted their protests, often supported by drums and

5   whistles, and occasionally other noisemakers.  They engaged in conversation with Walk

6   participants and with those in the surrounding community about their disagreement with

7   the CCEA and City agenda for Skid Row.

8       68.     City Attorney Carmen Trutanich attended the Walk on April 6, 2011, the

9   night of the second protest, and advised defendant Lopez, according to an e-mail she

10  sent her board of directors, that he "would explore all legal options to protect [CCEA]

11  and allow us to conduct our walk without interference from LA CAN."

12      69.     On April 28, 2011, Becky Dennison and Pete White, Co-Directors of LA

13  CAN, sent a letter to defendant Lopez and to the Los Angeles Homeless Services

14  Authority (who often had staff participating in the Walk), explaining that they were

15  protesting the Walk because "it supports and promotes the criminalization of

16  homelessness and poverty and is comprised only of those from outside of our

17  community."  LA CAN urged Ms. Lopez and the CCEA "to end this condescending and

18  offensive walk through our community."  Defendant CCEA responded by demanding

19  that LA CAN stop all protests of the Walk.

20      70.     Plaintiffs are informed and believe that prior to the June 1, 2011 Walk,

21  defendants formulated a plan to seek to pursue false criminal charges against LA CAN

22  for their protests. Plaintiffs are informed and believe that the plan was discussed by and

23  between, among others, Ms. Lopez, her staff, and LAPD officers, particularly Lt.

24  Paulson.

25      71.     During the June 1, 2011 Walk, a large contingent of community

26  members, led by LA CAN and including Ms. Burton, participated in a protest of the

27  CCEA Skid Row Walk. They held up signs, chanted, and used various noise-makers,

28

FIRST AMENDED COMPLAINT

1  including clapping their hands, drumming, sounding toy air-horns and speaking through

2  a mega-phone.  The air-horns were generally used in rhythm with the chanting.

3  Periodically, plaintiff Burton , who held an air-horn, raised it above her head, directing

4  the sound over the people in the crowd.

5        72.     During the protest, defendants Paulson and Lopez were present and in

6  frequent contact with each other.  CCEA's lawyer was present, along with his two

7  videographers.  At CCEA and Ms. Lopez' direction, the videographers were filming the

8  conduct of LA CAN and other protesters in an effort to document some misconduct on

9  their part. Additionally, a large number of police officers under Lt. Paulson's command

10  and defendant BID guards working for CCEA were present.  City Attorney Trutanich

11  arrived during the course of the Walk in apparent support of Ms. Lopez, the CCEA and

12  their agenda.  No protester committed any crime.  CCEA's videographers documented

13  no crime.  No protester was arrested or cited.

14        73.     That same evening, after the Walk, defendant CCEA's Director of

15  Operations Steve Keyser, a former LAPD Lieutenant, e-mailed defendant Paulson and

16  told her that CCEA would like the LAPD to take criminal enforcement action against

17  LA CAN based on the noise at their protest of the Walk.  Lt. Paulson told him that she

18  too would like to pursue criminal charges against LA CAN members, but that the City

19  Attorney's police litigation unit had already advised her that any arrest risked violating

20  their First Amendment rights.

21        74.     On June 29, 2011, Mr. Keyser e-mailed defendant Paulson again,

22  repeating that CCEA wanted the LAPD to pursue criminal charges against LA CAN,

23  and asking that she meet with him and CCEA's lawyer to come up with a strategy for

24  the next Walk scheduled for July 6, 2011.  Plaintiffs are informed and believe that Mr.

25  Keyser's communications were made at Ms. Lopez' direction.  Mr. Keyser and Lt.

26  Paulson then formulated a plan to accuse LA CAN members of assault based on their

27  use of air-horns during the June 1 protest.  However, Lt. Paulson, in an e-mail, said she

28

FIRST AMENDED COMPLAINT

1    was "not sure who to make the victims as of yet."  In this email, Lt. Paulson asked Mr.

2    Keyser if he knew a "friendly" doctor who would testify on their behalf regarding the

3    noise at the protests.  Mr. Keyser and Ms. Lopez confirmed by e-mail the next day that

4    they supported this plan.

5        75.    On July 2, 2011 defendant Paulson e-mailed CCEA to say that she was

6    "bound and determined to stack the deck as far as possible" so that the City Attorney

7    would prosecute any LA CAN member against whom they made accusations.   In this

8    e-mail, Lt. Paulson colluded with CCEA leadership to create a biased crime report to

9    support their accusations, including asking them for their "permission" to describe the

10   purpose of the Skid Row Walk and offering them the opportunity to "edit or add

11   anything to" the report.  The arrest report was designed to portray CCEA and the Walk

12   in a positive light in order "to overcome an argument that [the Skid Row Walk] is just a

13   propaganda/re-gentrification effort," and to de-legitimize the LA CAN protest.

14       76.    This July 2, 2011 e-mail acknowledged that, though they were

15   determined to accuse LA CAN members of assaults with air-horns, they needed to

16   identify more people, "other than the Asst. Director at the Midnight [Mission]…who

17   can articulate discomfort due to the air horns."  In her report, written not long after this

18   e-mail was sent, defendant Paulson falsely claimed to have witnessed plaintiff Deborah

19   Burton walk up to Mai Lee, the assistant director at the Midnight Mission, and sound

20   the air-horn directly in her ear from a distance of less than one foot.  This claim formed

21   the basis of one of the assault charges later filed against Ms. Burton.  However, video

22   taken by CCEA videographers, and reviewed by Lt. Paulson prior to submitting the

23   report for filing, definitively contradicted this claim, instead showing that Ms. Burton

24   sounded the horn up in the air and not in Ms. Lee's ear.  The video also showed that

25   Ms. Burton was no closer than eight feet from Ms. Lee at the time she sounded the air-

26   horn.  Lt. Paulson also falsely claimed in the same report, that Ms. Burton had sounded

27   her air-horn from point blank range into Mr. Keyser's ear.  However, the CCEA video

28

FIRST AMENDED COMPLAINT

1  again disproved this false assertion, showing instead that Ms. Burton sounded the air-

2  horn into the air as Mr. Keyser was at least fifteen feet away from her and walking

3  away.  Lt. Paulson included both of these false claims in her report, despite having

4  viewed the videotapes that disprove them.

5         77.      On July 1, 2011, defendant Paulson contacted the Los Angeles City

6  Attorney's office to lobby them to file charges against LA CAN members whom she

7  intended to arrest at the upcoming July 6, 2011 protests.  Lt. Paulson claimed to have

8  video showing assaults with air-horns, though no such evidence existed, as no assaults

9  occurred.

10         78.      On July 2, 2011, defendant Paulson informed defendant Lopez and Mr.

11  Keyser that she intended to contact allies of CCEA who were present at the recent

12  protests to find out who would be willing to be listed as a victim or witness to LA

13  CAN's purported criminal actions. On July 5, 2011, the day before the next protest, Ms.

14  Lopez and Mr. Keyser met with the Lt. Paulson to further discuss pursuing criminal

15  prosecution against LA CAN and its members.  At this meeting, Ms. Lopez claimed

16  discomfort in her ear due to the general noise from the June 1, 2011 protest, but did not

17  make any specific accusation against any one person, nor claim that the discomfort

18  resulted specifically from an air-horn.

19         79.      On July 6, 2011, defendant Paulson e-mailed to a list of CCEA

20  supporters asking if they would be willing to be listed as witnesses or victims on a

21  crime report regarding LA CAN's protest.

22         80.      On July 6, 2011, defendant LAPD held a videotaped briefing prior to

23  that evening's Walk.  Lt. Paulson outlined the LAPD tactical plan for the Walk and

24  distributed pictures of LA CAN staff and organizers on whom she wanted officers to

25  focus. These included pictures of Deborah Burton, Eric Ares, Becky Dennison, Steve

26  Diaz and Hamid Khan, all LA CAN staff.  Lt. Paulson instructed the officers to avoid

27  arresting people on busy streets, suggesting other locations such as Gladys Street.

28

FIRST AMENDED COMPLAINT

81.      During the Walk on July 6, 2011, there was a large LAPD presence.  LA
CAN co-Executive Director Pete White was videotaping the Walk. As the Walk neared
the corner of Fifth and Gladys Streets, Lt. Paulson arrested him.  After the arrest Lt.
Paulson spoke to Ms. Dennison and informed her that she had "no right" to send the
April 28, 2011 letter criticizing the walk to the City Attorney and CCEA.  LAPD
released Mr. White that night with a citation to appear in criminal court.  However, no
charges were filed.

82.      Over the next several months, defendant Lopez met with high level
officials at the City Attorney's office in order to pressure them to file criminal charges
against LA CAN members for protesting the Walk.  Defendants LAPD and Paulson
supported defendant CCEA's efforts to pressure the City Attorney to file charges,
including personally delivering the arrest report and videos to the City Attorney's office
"in an effort to convey its importance."  Lt. Paulson said in an e-mail that, although the
situation appears to be "merely a 'technical violation' of the law,"  she would "place the
full resources of my 50-officer task force at the disposal of your office should any leg
work or additional effort be necessary to find some legal, prosecutorial remedy to this."

83.      In the fall of 2011, the City Attorney declined to file charges against Mr.
White of LA CAN for his conduct at the July 6, 2011 protest.  They had no basis to
believe that he had committed any crime.  On November 8, 2011, the City Attorney's
office contacted defendant Paulson and indicated that she needed to conduct further
investigations if they were to bring a case against any LA CAN members.  At this point,
Lt. Paulson focused on plaintiff Deborah Burton and her use of the air-horn during the
June 1, 2011 protest.  On November 10, 2011, Ms. Lopez met with Lt. Paulson and
claimed, for the first time, more than five months after the incident, that Ms. Burton had
attacked her with an air-horn, by sounding it directly in her ear at point blank range.

84.      Defendant Lopez claimed to have suffered serious ear trauma, including
significant hearing loss, pain and constant ringing in her ears, caused by Ms. Burton's

1  action. However, she had not had an ear doctor check her ears until over two months

2  after the supposed injury occurred. The doctor did find some hearing loss in her right

3  ear, and noted Ms. Lopez' subjective claims of ringing in her ears. Lt. Paulson

4  documented the claimed ear injury in her reports. However, Lt. Paulson did not

5  document that Ms. Lopez had an over thirty year history of ear troubles, including

6  recurring hearing loss in that same ear and a diagnosis of Menieres disease or a

7  condition called Cochlear Hydrops, also in that same ear, which can cause hearing loss.

8  This alleged injury became the basis for a criminal charge of assault causing serious

9  bodily (California Penal Code section 243(d)) against Ms. Burton.

10       85.     On June 29, 2012, defendant Lopez emailed Deputy City Attorney Brad

11  Rothenberg and informed him that she would bring him the "unedited" video that shows

12  Ms. Burton blowing the air horn in her ear. No video exists that shows Ms. Burton

13  sounding an air-horn in Ms. Lopez' ear.

14       86.     On July 23, 2012, more than one year after the June 1, 2011 Walk, the

15  City Attorney's office filed assault charges against Ms. Burton, for crimes they claimed

16  she committed that day with the toy air-horn. They charged two counts of assault likely

17  to cause great bodily injury (Penal Code section 245(a)(4)) and one count of battery

18  causing serious injury (Penal Code section 242-243(d)).

19       87.     Ms. Burton learned of these charges in August, 2012, when an LAPD

20  officer approached her while she was on Community Watch, and told her that there was

21  a warrant out for her arrest and that he would arrest her next time he saw her. In fact,

22  there was no warrant. This threat caused Ms. Burton great fear and anxiety and

23  interfered with her ability to work as an organizer.

24       88.     On August 9, 2012, in response to a press release issued by the City

25  Attorney or Ms. Lopez, or possibly by both, the Downtown News printed an article

26  publicizing Ms. Lopez and Lt. Paulson's false accusations against Ms. Burton.

27

28

FIRST AMENDED COMPLAINT

89.      On August 22, 2012, Ms. Burton appeared in Los Angeles Superior Court to face the criminal charges. She was terrified and anxious about the possibility that she might serve jail time based on these false allegations, and about the damage to her reputation.  From the date of her arraignment until the resolution of the charges, Ms. Burton had trouble sleeping and felt constantly nervous.  Her ability to work suffered, as did her relationships with family, friends and co-workers.  She suffered physical and psychological harm and damage to her health because of the stress of defending herself from these accusations.

90.      On June 28, 2013, Deborah  Burton's criminal trial began in the Superior Court in Norwalk before Judge Patrick Meiers.  On July 11, 2013, the jury returned a verdict of not guilty on all counts, including the lesser included offenses of three counts of simple assault and one count of battery.

### COMPLIANCE WITH TORT CLAIMS ACT

91.      On December 18, 2013 plaintiff Burton filed a claim for damages with the City of Los Angeles, claim number C14-2453. On January 7, 2014 the City Attorney's Office denied the claim.

### FIRST CLAIM FOR RELIEF

### FREEDOM OF SPEECH AND ASSOCIATION

### (42 U.S.C. §1983 – 1st and 14th Amendments)

### (By All Plaintiffs Against All Defendants)

92.      Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

93.      Defendants, all state actors or acting under color of state law, owed plaintiffs a duty under the First and Fourteenth amendments to the U.S. Constitution to permit plaintiffs free exercise of free speech and association.

FIRST AMENDED COMPLAINT

94.    The policies and actions of the defendants, as set forth above, intended to disrupt, misdirect, discredit or otherwise neutralize and suppress, punish and chill plaintiffs' protected activities.

95.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered, and continue to suffer harm. For Deborah Burton, her damages include, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress. For LA CAN, its injuries include, but are not limited to, frustration of mission and diversion of resources.

96.    Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

## DUE PROCESS

### (42 U.S.C. §1983 – 14th Amendment)

### (By All Plaintiffs Against All Defendants)

97.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

98.    Defendants, all state actors or acting under color of state law, owed plaintiffs a duty under the fourteenth amendment to the U.S. Constitution to procedural due process.

99.    The policies and actions of the defendants, as set forth above, violated plaintiffs' right to due process of law by detaining or conspiring to detain plaintiffs in order to disrupt, misdirect, discredit or otherwise neutralize and suppress, punish and chill plaintiffs' protected activities.

100.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered, and continue to suffer harm. For Deborah Burton, her damages include, but are not limited to, physical injury, mental anguish, fear, anxiety,

FIRST AMENDED COMPLAINT

humiliation and emotional distress. For LA CAN, its injuries include, but are not limited to, frustration of mission and diversion of resources.

101.    Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

## RETALIATION

### (42 U.S.C. §1983 – 1st Amendment Retaliation)

### (By All Plaintiffs Against All Defendants)

102.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

103.    Defendants, all state actors or acting under color of state law, had a duty under the First Amendment of the U.S. Constitution to permit plaintiffs free exercise of their First Amendment rights.

104.    When plaintiffs exercised these rights, defendants retaliated, or conspired to retaliate against plaintiffs in the manner alleged herein for participation in what defendants knew or should have known was First Amendment protected activity.

105.   As a proximate result of defendants' wrongful conduct, plaintiff Burton suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress. For LA CAN, its injuries include, but are not limited to, frustration of mission and diversion of resources.

106.    Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

FIRST AMENDED COMPLAINT

# FOURTH CLAIM FOR RELIEF

## MALICIOUS PROSECUTION

### (42 U.S.C. §1983)

### (By Plaintiff Deborah Burton Against All Defendants)

107.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint in paragraphs 64-91.

108.    Defendants' criminal prosecution of plaintiff Burton resulted in an acquittal of all charges.

109.    Defendants prosecuted Burton with malice and without probable cause.

110.    Defendants prosecuted plaintiff Burton for the purpose of denying her right secured under the First, Fourth and Fourteenth Amendments.

111.    As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

# FIFTH CLAIM FOR RELIEF

## MALICIOUS PROSECUTION

### (California State Law)

### (By Plaintiff Deborah Burton Against Defendants CCEA and Lopez)

111.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint in paragraphs 64-91.

112.    Defendants' criminal prosecution of plaintiff Burton resulted in an acquittal of all charges.

113.    Defendants prosecuted Burton with malice and without probable cause.

FIRST AMENDED COMPLAINT

114.    As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

## SIXTH CLAIM FOR RELIEF

## THREATS, INTIMIDATION OR COERCION

### (Civil Code §52.1)

### (By Plaintiff Deborah Burton Against All Defendants)

115.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

116.    Defendants by their conduct interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with the exercise or enjoyment of plaintiff's rights as secured by the First, Fourth and Fourteenth Amendments to the United States Constitution or laws of the United States, [and of the rights secured by the Constitution or laws of the state of California, including but not limited to California Constitution Article I, sections 1, 2, 7 and 13].

117.    As a proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm, in an amount totaling no less than $4,000 for every violation.

118.    Plaintiff is informed and believes, and thereon alleges, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF A MANDATORY DUTY

### (Government Code §815.6 )

### (By All Plaintiffs Against City and LAPD)

FIRST AMENDED COMPLAINT

119.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

120.     California Constitutional provisions are mandatory and prohibitory under Article I, § 26.

121.     Constitutional provisions and statutes are "enactments" under which Defendants City of Los Angeles and LAPD have a mandatory duty to act.

122.     The foregoing enactments are intended to protect against the kind of risk of injury suffered by plaintiffs.

123.     As a proximate result of defendants' breach of their mandatory duties, plaintiffs suffered, and continue to suffer harm.

124.     Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Deborah Burton Against Defendants CCEA and Lopez)

125.     Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

126.   Defendants' conduct as described above was so extreme that it exceeded all possible bounds of decency and was so outrageous that any reasonable person would regard it as intolerable.  Defendants abused their authority to give them real and apparent power to affect the plaintiff's interests.

127.   In engaging in the conduct, defendants intended to cause such emotional distress and/or acted with reckless disregard for the probability that plaintiff would suffer emotional distress from their conduct.

FIRST AMENDED COMPLAINT

128.    As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

## PRAYER FOR RELIEF

Wherefore, plaintiffs seek judgment as follows:

129.    A preliminary and permanent injunction enjoining defendants, their officers, agents and employees from interfering with plaintiffs' constitutionally protected rights;

130.    For a declaration that defendants' past, present and threatened future actions violate plaintiffs' civil and constitutional rights;

131.    Compensatory, general and special damages in an amount according to proof and as permitted by law;

132.    Damages under federal law for both plaintiffs;

133.    Damages under state law for plaintiff Deborah Burton, including pursuant to California Civil Code §52;

134.    For punitive damages against defendants sued in their individual capacity;

135.    Attorneys' fees and costs as provided for by 42 U.S.C. §1988, Civil Code §52.1(h), C.C.P. §1021.5, and all applicable provisions of law;

136.    Costs of suit; and

137.    Such other relief as the Court finds just and proper.


Dated:  March 26, 2014                Respectfully submitted,
                                      Legal Aid Foundation of Los Angeles
                                      Hadsell Stormer Richardson & Renick LLP
                                      Law Office of John L. Raphling

                                      By: _____
                                          Barbara J. Schultz

38

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 1500 West Eighth Street., Los Angeles, CA 90017

On March 26, 2014, I served the attached FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

PLEASE SEE ATTACHED SERVICE LIST

SERVICE BY EMAIL:

X    By Email:  Personally transmitting the document(s) via electronic service to the e-mail addresses set forth below on this date.

Executed on March 26, 2014, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Karen Ruiz

(Type or print name)



(Signature)

PROOF OF SERVICE

1

## SERVICE LIST

2

3   Donald H. Steier, Esq.
    Guzin & Steir
4   4525 Wilshire Blvd., Ste. 201
    Los Angeles, CA 90010
5   Email: donsteier@gslawla.com
6   **Attorney for Defendants**
    **Central City East Association,**
7   **Downtown Industrial District Business Improvement District,**
8   **and Estela Lopez**

9

10

11  Wendy Shapero, Esq.
    Michael N. Feuer, Esq.
12  Cory, M. Brente, Esq.
    Craig J.Miller, Esq.
13  200 North Main Street
14  6th Floor, City Hall East
    Los Angles, CA 90012
15  Email: wendy.shapero@lacity.org
16  **Attorneys for Defendant**
    **City of Los Angeles, Los Angeles Police Department,**
17  **Sharon Paulson, and Charlie Beck**

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE