Barbara J. Schultz  (SBN 168766) bschultz@lafla.org
Paul J. Estuar (SBN 167764) pestuar@lafla.org
**LEGAL AID FOUNDATION OF LOS ANGELES**
1102 Crenshaw Boulevard
Los Angeles, CA 90019
Tel:     (213) 640-3823
Fax:    (213) 640-3802
Attorneys for Plaintiff CANGRESS

[Additional counsel listed on next page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANGRESS, a non-profit corporation, DEBORAH BURTON, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; CENTRAL CITY EAST ASSOCIATION; DOWNTOWN INDUSTRIAL DISTRICT BUSINESS IMPROVEMENT DISTRICT;; SHANNON PAULSON, individually and in her official capacity; ESTELA LOPEZ, as an individual; DOES 1 -10.<br><br>Defendants. | Case No.  CV 14-01743 SVW (MANx)<br><br>**FOURTH AMENDED COMPLAINT FOR  DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**<br><br>1. FREEDOM OF SPEECH AND ASSOCIATION (U.S.C. § 1983-1st Amendment)<br>2. RETALIATION (42 U.S.C. §1983–1ST Amendment)<br>3. MALICIOUS PROSECUTION (42 U.S.C. § 1983)<br>4. MALICIOUS PROSECUTION (California State Law)<br>5. THREATS, INTIMIDATION OR COERCION (Civil Code § 52.1)<br>6. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

FOURTH AMENDED COMPLAINT

[Additional Counsel]

Dan Stormer (SBN 101967) dstormer@hadsellstormer.com
Joshua Piovia-Scott (SBN 222364) jps@hadsellstormer.com
**HADSELL STORMER & RENICK LLP**
128 N. Fair Oaks Ave., Suite 204
Tel:    (626) 381-9261
Fax:   (626) 577-7079
Attorneys for All Plaintiffs


John L. Raphling (SBN 169554) johnraphling@yahoo.com
**LAW OFFICE OF JOHN L. RAPHLING**
723 Ocean Front Walk
Venice, CA 90291
Tel:  (310) 450-8093
Fax: (310) 450-8490
Attorneys for All Plaintiffs

FOURTH AMENDED COMPLAINT

Plaintiffs CANGRESS, aka Los Angeles Community Action Network ("LA CAN") and Deborah Burton, bring this Complaint for Declaratory Relief,  Injunctive Relief and Damages against the City of Los Angeles, the Los Angeles Police Department, the Central City East Association, the Downtown Industrial District Business Improvement District, , Shannon Paulson, individually and in her official capacity, and Estela Lopez, individually. This court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §§1331, 1343 and 1367.

## PRELIMINARY STATEMENT

1.      LA CAN, a community organization representing poor people in Skid Row, and one of their organizers, Deborah Burton, bring this lawsuit to stop Defendants from unlawfully silencing their voices in the debate about the future of downtown Los Angeles.  Defendants have used a variety of illegal tactics to suppress LA CAN's First Amendment right to organize, protest, speak out and advocate.  These tactics include harassment, intimidation, threats of arrest, arrests, denial of access to public space and public meetings, and the malicious, fabricated prosecution of Ms. Burton for crimes she did not commit.  LA CAN and Ms. Burton ask the Court to enjoin defendants and seek compensation for harm done to them.

2.      Just a few blocks from the seat of government and judicial power in Los Angeles is Skid Row, the most intense concentration of homelessness and extreme poverty in the United States.  In its current form Skid Row, sometimes known as "Central City East," was the product of careful planning by the City of Los Angeles dating back to the 1970's aimed at containing the destitute and homeless and keeping them separated from areas to the west deemed worthy of development.  Over the past four decades, the numbers of extremely poor and homeless residents in Skid Row has increased dramatically, as has the proportion of non-white persons, particularly African American men.

3.     Over the same period, the potential development value of Skid Row also rose dramatically, leading to intense pressure by developers and landlords to displace poor tenants and to force homeless people from the area, by means both legal and otherwise.   Many business interests and the City officials who support them apparently see the existence of high concentrations of poor people in the area, especially African-American men and the highly visible homeless population, as an obstacle to planned business expansion and development.  Those business interests are organized by the leaders of City-sanctioned "Business Improvement Districts," including defendant Downtown Industrial District Business Improvement District, operated by defendant Central City East Association.

4.     These business interests and City officials have devised a campaign to make Skid Row a hostile environment for the very poor and homeless, culminating with the 2006 launch of the "Safer Cities Initiative" or SCI.   SCI is undoubtedly the most concentrated and sustained use of police force in any neighborhood in America.   SCI officers do little to curb serious crime.  Instead, they stop, interrogate, question, cite and harass the poor, homeless, and non-white residents of Skid Row, and enforce so-called "quality of life" laws, which are generally ignored elsewhere in the City.

5.     Plaintiff LA CAN is a grassroots community organization that has advocated since 1999 for the rights of the people of Skid Row, including poor tenants, people of color and homeless people, against these efforts to displace them.  LA CAN is the only organization in Skid Row whose membership primarily lives in Skid Row and whose sole purpose is advocacy for those poor and homeless residents of Skid Row whose voices are otherwise unheard in the halls of power in the City.  LA CAN has consistently objected to SCI and protested its harmful effects on the Skid Row community.

6.     Defendant City and its police department, in collaboration with defendant Central City East Association and its leadership, have responded to LA CAN's

FOURTH AMENDED COMPLAINT

1   advocacy by imposing an ongoing campaign of threats, harassment and intimidation to

2   silence the one loud voice of Skid Row's poor and homeless.

3       7.    Plaintiffs bring this lawsuit to address defendants' wrongful and illegal

4   conduct in targeting LA CAN, its staff and members by continually violating their civil

5   rights in an attempt to shut them up. Defendants have harassed, intimidated, arrested,

6   and wrongfully prosecuted plaintiffs, in order to remove community opposition to the

7   Safer Cities Initiative and other policies that criminalize poor people. Defendants'

8   actions have diverted LA CAN's resources and frustrated their mission by interfering

9   with its ability to advocate for the preservation of housing and for additional resources

10   for the Skid Row community, to promote healthy living and nutrition, to educate the

11   community about their rights, to advocate for community safety, and to help assert their

12   basic civil and human rights.  In addition, defendants' malicious prosecution and

13   conspiracy against plaintiff Deborah Burton has caused her both physical and emotional

14   injury.

15       8.    Defendants City of Los Angeles, Los Angeles Police Department

16   ("LAPD") and Lieutenant Shannon Paulson have violated plaintiffs' First Amendment

17   rights by developing, establishing and/or implementing procedures, policies,

18   regulations, practices and/or customs which result in LAPD engaging in intimidation

19   tactics such as placing LA CAN under surveillance, blocking LA CAN from

20   videotaping police activity, wrongfully detaining and arresting LA CAN staff and

21   members, threatening arrest for protected First Amendment activity, publicly and

22   falsely denigrating LA CAN, targeting LA CAN staff and members at LAPD roll calls

23   and through emails, and maliciously prosecuting Deborah Burton for crimes she did not

24   commit as an effort to punish her for speaking out and to silence the entire organization.

25       9.    Defendants Central City East Association, led at all relevant times by

26   defendant Estela Lopez, conspired with City and LAPD, particularly Lt. Shannon

27   Paulson, to deprive plaintiffs of their civil rights by strategizing with LAPD and the

28

City Attorney's office to the target LA CAN by falsely accusing Deborah Burton of criminal activity.  Defendants Central City East Association, Lopez and Paulson worked together to formulate a strategy to prosecute Ms. Burton and silence LA CAN, including editing police reports to distort facts against LA CAN, having Lopez volunteer to be a purported victim, aid in a bogus investigations and promote the untrue accusations in the media.

## JURISDICTION AND VENUE

10.   Plaintiffs bring this action for declaratory relief, injunctive relief and damages under 42 U.S.C. §1983  and under state law.

11.   This Court has jurisdiction under 28 U.S.C. §§1331, 1343 and 1367, including supplemental jurisdiction over the state law causes of action because they form part of the same case or controversy as the federal law claims.

12.   The acts and omissions complained of herein took place within the Central District of California. Defendants reside in the Central District. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## PARTIES

13.   Plaintiff CANGRESS doing business as Los Angeles Community Action Network ("LA CAN"), is a California non-profit corporation exempt from taxation under section 501(c)(3) of the Internal Revenue Code, and has its principal place of business in the City and County of Los Angeles.

14.   Plaintiff Deborah Burton ("Burton") is, and at all times herein alleged, has resided in the City and County of Los Angeles, in the jurisdiction of the State of California. Plaintiff Burton is a sixty-two year old African-American woman who is an organizer working for LA CAN.

15.   Defendant City of Los Angeles ("City") is, and at all times herein alleged was, a municipal corporation or political subdivision organized and existing under the laws of the State of California.

FOURTH AMENDED COMPLAINT

16.     Defendant Los Angeles Police Department ("LAPD") is, and at all times herein alleged was, an agency of the City of Los Angeles.

17.     Defendant Central City East Association, Inc. ("CCEA") is, and at all times herein alleged was, a non-profit business corporation exempt from taxation under section 501(c)(6) of the Internal Revenue Code, and has its principal place of business in the City and County of Los Angeles. CCEA's purports to represent the interests of 1,500 business and property owners in Central City East neighborhood. All references to "CCEA" throughout this complaint also include the Downtown Industrial District Business Improvement District.

18.     The Downtown Industrial District Business Improvement District ("BID") is a quasi-governmental agency, financed through a special assessment upon real estate properties that receive special benefits from the improvements and activities and are sanctioned and created by the City pursuant to Streets & Highways Code §36501. The BID is administered through CCEA.

19.     Defendant Estela Lopez ("Lopez") was the executive director of  CCEA and the BID at all times relevant in this complaint and is sued in her individual capacity. Defendants CCEA, BID and Lopez are also referred to herein as the "Private Defendants."

20.     Defendant Lt. Shannon Paulson ("Paulson") is an officer with LAPD and is sued in her official and individual capacities. She was the commanding officer of the SCI deployment at all relevant times in this complaint. Defendants City, LAPD and Paulson are also referred to herein as the "Public Defendants."

21.     The true names and capacities of defendants DOES 1 through 10, inclusive, are presently unknown to plaintiffs who therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to set forth the true names and capacities of said defendants when such has been ascertained. Plaintiffs are further informed and believe, and thereon allege, that each of the fictitiously named defendants

FOURTH AMENDED COMPLAINT

1 | aided and assisted the named defendants in committing the wrongful acts alleged
2 | herein, and that any damages they have sustained, as alleged herein, were proximately
3 | caused by such defendants.

4 |      22.    Plaintiffs are informed and believe, and thereon allege, that at all times
5 | herein mentioned, each of the defendants was the agent and/or employee and/or co-
6 | conspirator of each of the remaining defendants, and in doing the things hereinafter
7 | alleged, was acting within the scope of such agency, employment and/or conspiracy,
8 | and with the permission and consent of the other co-defendants.

9 |      23.    Plaintiffs are informed and believe, and thereon allege, that at all times
10 | herein mentioned, each of the defendants acted as joint actors with joint obligations, and
11 | that each defendant was and is responsible for the conduct and injuries alleged herein.

## MONELL ALLEGATIONS

     24.    The City's recent legal troubles with persons engaged in First Amendment protected activity is well-documented. In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.,* CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force, including the use of less-lethal munitions, during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000.

     25.    In February, 2009, the City agreed to pay nearly $13 million to people injured during a May Day demonstration and rally in MacArthur Park when they were attacked by LAPD officers armed with batons and rubber bullets. *MIWON, et al. v. City of Los Angeles, et al.,* CV 07-3072 AHM (FMOx).

     26.    In December, 2012, the City was sued by members of the Occupy Los Angeles movement arising out of the forcible removal, arrest and detention of

FOURTH AMENDED COMPLAINT

demonstrators who were encamped on the south lawn of City Hall. *Aichele, et al. v. City of Los Angeles, et al.,* CV 12-10863 DMG (FMx).

27.     In February 2011, then City Attorney Carmen Trutanich famously announced a get-tough policy of prosecuting people arrested during political demonstrations. The policy, he stated, was designed with an eye on what he called "professional" protesters who demonstrate repeatedly and never seem to be punished for their illegal activities. To deter protest, the City Attorney announced that his office would begin pressing for jail time in cases that previous prosecutors had treated as infractions.[1]

28.     The City, not limited to but including through its policymakers, the Los Angeles Police Department, and the leadership of the LAPD maintains and enforces a policy, custom and/or practice of discriminating and retaliating against persons engaged in lawful First Amendment activity, including the imposition of unlawful restrictions on plaintiffs' exercise of their First Amendment rights. The First Amendment activity includes, but is not limited to, the following:

      a.  Participation at public meetings;

      b.  Engaging in public protest;

      c.  Use of public space for protest;

      d.  Use of chanting, musical instruments, signage, noisemakers, tents, and information tables;

      e.  Videotaping, photographing and observing LAPD activity in Skid Row;

      f.  Documenting LAPD activity in Skid Row;

29.     The City, not limited to but including through its policymakers, the Los Angeles Police Department, and the leadership of the LAPD is and was aware of the

---

[1] http://articles.latimes.com/2011/feb/11/local/la-me-protester-prosecution-20110211

FOURTH AMENDED COMPLAINT

aforementioned policy, custom and practice, and were deliberately indifferent to the constitutional violations perpetrated against the plaintiffs. The City and its policymakers were aware of the unconstitutional policy both as a result of the multiple complaints lodged by the plaintiffs, and because the policy was so persistent and widespread that the City's policymakers should have known of its existence, and were deliberately indifferent to the constitutional violations perpetrated against the plaintiffs.

## FACTUAL ALLEGATIONS
### History of Skid Row

30.     Skid Row is a geographical area containing approximately fifty city blocks immediately east of downtown Los Angeles.   Nearly all of the approximately 14,000 people who live in the Skid Row area are extremely low income. The majority are African-American.  About two-thirds of Skid Row residents live in residential hotels. The remaining one-third are homeless.[2]  49.3% of homeless people in the City of Los Angeles are African-American and 24.4% are Latino.[3]

31.     The City created Skid Row in its current form by implementing a policy of "containment"[4] of the extremely poor and homeless in the City.  This containment policy concentrated homeless services and residential hotels in Skid Row, and effectively excluded such services and housing elsewhere, particularly South Central Los Angeles, which had a very high proportion of extremely poor and homeless individuals. Forced by hunger and other basic needs to leave their own neighborhoods,

---

[2]  Los Angeles Homeless Services Authority, (LAHSA), 2011 Greater Los Angeles Homeless Count, available at http://documents.lahsa.org/planning/homelesscount/2011/HC11-detailed-geography-report.PDF, at p. 37.
[3] Los Angeles Homeless Services Authority, (LAHSA), 2011 Greater Los Angeles Homeless Count, available at http://documents.lahsa.org/planning/homelesscount/2011/HC11-detailed-geography-report.PDF p. 23.
[4] Los Angeles Community Design Center, *Skid Row: Recommendations to Citizens Advisory Committee on the Central Business District Plan for the City of Los Angeles, Part 4: Physical Containment* (1976).

FOURTH AMENDED COMPLAINT

1   many sought refuge on Skid Row. There was little opposition to this containment policy
2   until business owners, who had been attracted to the area by cheap rents, organized and
3   began advocating police sweeps of homeless encampments in the mid-1980s.[5]

4       32.    In 1998, defendant CCEA formed a Business Improvement District in Skid
5   Row. The purpose of Business Improvement Districts is to provide services "above and
6   beyond" those provided by the City.[6] The BID on Skid Row deployed a private security
7   force, serving the business owners that patrol the public streets and sidewalks, often
8   contacting and harassing poor and homeless people.

9       33.    In 2002, Defendant City of Los Angeles approved the City Center
10  Redevelopment Plan in the downtown area with the purpose of "minimize[ing] the
11  overconcentration or exclusive concentration of such services within the Project Area."
12  The Community Redevelopment Agency's report to the City Council regarding the plan
13  estimated that it would result in the destruction of 4,178 units of affordable housing.
14  Notably, the plan included no provisions for services in other areas that might meet the
15  needs of the desperately poor and homeless in other areas lacking such an
16  "overconcentration."

17      34.    On September 24, 2006, then City Mayor Antonio Villaraigosa announced
18  the public launch of SCI on Skid Row. City officials claimed that there were to be two
19  main features of SCI:  the unprecedented "deployment of 50 more police officers to
20  Skid Row," and funding for programs "...leading those who need help to housing and

21

22

23

24  [5] See, e.g., Frank Clifford and Penelope McMillan, *Raids Meant to Rid Skid Row of Its Homeless*
25  *Encampments*, Los Angeles Times, p.1, February 19, 1987 (quoting the City's Community
    Redevelopment Agency President , James Wood , as saying that "the impetus for the [police sweep of
26  homeless encampments] came from Central City East, a business group representing about 40
    companies on Skid Row that for two years have been urging  City Hall to take more aggressive action
27  against crime and to clean up the area."
28  [6] "BIDS 101" at http://clerk.lacity.org/BusinessImprovementDistricts/index.htm

FOURTH AMENDED COMPLAINT

services."[7]    The police presence arrived immediately; the funding for programs for housing and services never materialized. In the first year alone, in an area with 14,000 residents, SCI officers issued approximately 10,000 citations to Skid Row residents. The vast majority of citations were for so-called "quality of life" offenses, including cross-walk violations, littering (despite the fact that defendants City and CCEA refused to provide trash cans), and sitting, lying or resting possessions on the sidewalk, despite the fact that thousands of Skid Row residents had no other choice.

### History of LA CAN

35.    LA CAN was established in 1999, to give voice to the extremely low income people living in residential hotels and on the streets of Skid Row. LA CAN has two co-executive directors, five full time organizers, three part time staff and several interns. LA CAN has more than 800 members, approximately 300 of whom are regularly involved and, of those, about 75 who are active "core" members. LA CAN's multiracial membership reflects the community's diversity.  65 percent are African American and 25 percent Latino. 75 percent are extremely low-income tenants, living in residential hotels, subsidized or public housing.  Many are currently or formerly homeless.

36.    In 2002, LA CAN organized in opposition to the City Center Redevelopment Plan including participating in a lawsuit.[8]  Negotiations led to a policy that protected all existing affordable housing in the downtown area, specifically preserving approximately 8,500 units of residential hotels.[9]

---

[7] Office of the Mayor Press Release, "City Launches Initiative to Reduce Crime on Skid Row; 50 More Police Officers Deployed to Area" September 24, 2006.
[8] Wiggins v. Board of Directors of the Community Redevelopment Agency, et.al., BC 276472 r/t 277539
[9] Id.

37.    In 2004 LA CAN, Legal Aid Foundation of Los Angeles, and UCLA El Centro Legal formed a weekly legal clinic that exposed patterns of illegal practices by residential hotel owners and civil rights violations by business improvement district guards and LAPD.  LA CAN has organized to address these problems.

38.    In November 2005, LA CAN launched the Community Watch program. As part of Community Watch, LA CAN trains and deploys staff and members to patrol the community in teams and document police and private security actions in order to prevent or at least expose civil and human rights violations in the community. Initially Community Watch was formed in reaction to community concerns about business improvement district private security guards' treatment of residents in public spaces over which they had no more legal authority than any other private person. When the City launched the so-called SCI in Skid Row, people in the community began reporting abuses by LAPD in addition to the problems they'd already had with the private guards. Community Watch began monitoring the activities of LAPD officers, which were often in close collaboration with private guards, including defendant BID.   In addition to monitoring LAPD officers through Community Watch, LA CAN has organized and advocated to curtail their abuses, through public protests, speaking out at community meetings, City Council hearings, Police Commission meetings and through the media..

39.    From 2004 to the present LA CAN has successfully organized to stop unlawful practices aimed at forcing poor tenants out of their residential hotel rooms to make space for those able to pay more.  These practices have included, "the 28 day shuffle," in which tenants are moved from unit to unit every 28 days in an effort to keep them from acquiring the rights of permanent tenants, the imposition of unlawful guest fees, maintenance of slum housing conditions, violations of California's redevelopment laws, racial and other discrimination and forced eviction and displacement. LA CAN has worked closely with past City Attorneys and other public officials to solve these problems. LA CAN also organized to pass the citywide Residential Hotel Ordinance,

which regulates and prevents the demolition and conversion of about 16,000 residential hotel units in Los Angeles.  LA CAN works on voter registration drives, violence prevention, and food justice issues. LA CAN has produced several community research and academic studies, including:  four Downtown Women's Needs Assessments[10], a Human Rights Assessment of the Safer Cities Initiative[11], and a participatory action research project focused on public health issues titled The Dirty Divide.[12] These are among the kinds of activities from which the unconstitutional and unlawful efforts of defendants have diverted LA CAN's organizational and financial resources.

## LAPD'S INTERFERENCE WITH LA CAN

40.    Defendant LAPD has a long history of interfering with LA CAN's community engagement activities, particularly the Community Watch program and other First Amendment expressive activities. LAPD routinely targets LA CAN staff and members by detaining, arresting, threatening arrest, harassing and intimidating, denying access to public spaces and public meetings, surveilling, and instigating baseless prosecutions.  LAPD's intentional targeting of LA CAN has harmed LA CAN's ability to fulfill its mission, recruit new members, and gain funding.

---

[10] "Downtown Women's Needs Assessment: Findings and Recommendations (2001)," http://cangress.org/wp-content/uploads/2013/04/2001needsassessment.pdf; "Many Struggles, Few Options: Finding and Recommendations from the 2004 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/2013/04/ 2004needsassessment.pdf; "Growing Need and Shrinking Opportunities: Finding and Recommendations from the 2007 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/ 2013/04/2007needsassessment.pdf; "2010 Downtown Women's Needs Assessment," http://cangress.org/wp-content/uploads/ 2013/03/DWAC_NeedsAssessment2010.pdf.

[11] "Community-Based Human Rights Assessment: Skid Row's Safer Cities Initiative," http://cangress.org/wp-content/uploads/2012/11/sci-2010-report-final1.pdf.

[12] "The Dirty Divide in Downtown Los Angeles: A Call for Public Health Equality," http://cangress.org/wp-content/uploads/2012/11/Dirty-Divide-Complete-April-2013.pdf.

**A.** **LAPD's interference with Community Watch**

41.     From the inception of Community Watch, LAPD interfered with team members' ability to document police interaction with residents. LAPD officers order Community Watch team members, and only Community Watch team members, including Ms. Burton to move away from positions on public sidewalks from which LAPD's interactions with residents of Skid Row could be observed and video-recorded. Officers frequently block team member's cameras with their hands and bodies. Officers have pushed, impeded, harassed, threatened with arrest, and on a few occasions detained team members, including Ms. Burton, for asserting their right to witness and film police activity from a safe distance, in places where other people are allowed to observe.

42.     Plaintiffs are informed and believe that during arrests in which Community Watch team members, including Ms. Burton are observing and videotaping, LAPD officers tell arrestees to request that LA CAN turn off their cameras and threaten harsher treatment to those who do not make the request.

**B.** **LAPD Interference with Other LA CAN Community Engagement Activities**

43.     During  the summer of 2007, an LAPD patrol car routinely parked directly in front of LA CAN's office for a half hour every morning.  Officers sat in the car and watched LA CAN's staff, members and guests come in and out. Plaintiffs are informed and believe that the sole purpose of this LAPD activity was to intimidate LA CAN staff and members.

44.     On April 7, 2010, then City Attorney Carmen Trutanich held a press conference in Gladys Park within the Skid Row community to announce the filing of an injunction against people identified by the police as drug dealers.  The injunction named approximately eighty people, but also applied to up to 300 more people, identified only

as "John Does."  LA CAN members, including Ms. Burton, and others attended the press conference to protest the injunction, understanding that it would be used as a tool of racial profiling and criminalization of poor people.  Mr. Trutanich disparaged LA CAN and its members, accusing them during his public statement of supporting and possibly being "drug dealers."  One published blog post quoted Mr. Trutanich as saying in reference to the LA CAN protesters, "You have to wonder if the people behind me are not in cahoots with the people providing the narcotics to the area."[13]

### C.    Publication of anti-LA CAN material by LAPD

45.    During all relevant times herein, Officer Deon Joseph was LAPD's designated Senior Lead Officer for the Skid Row neighborhood.  One of the primary job duties of senior lead officers is to act as a liaison with the community and "provide a link that helps unite the LAPD with the communities it serves."[14]

46.    In or about 2007, Joseph, as part of his official duties as Senior Lead Officer, began posting entries on the LAPD's publicly-posted blog (www.lapdblog.org), as well as distributing printed handouts targeting and demeaning LA CAN and highlighting the animus of the LAPD towards LA CAN's exercise of its First Amendment rights.

47.    In a March 2, 2007 LAPD blog entry entitled "Action vs. Activism," Joseph claimed LA CAN fed the public "perverted versions" of the truth. Joseph wrote that the "activist group" "[did] not care how many people get stabbed, overdose, or robbed on skid row," or "how many officers' good names they smear, or how long they stymie the system, as long as in the end they get what they what [sic] they want." He claimed that the group empowered the criminal element to see their lawless behavior as a "civil right." Joseph attempted to portray LA CAN as an enabler and fomenter of

---

[13] http://blogdowntown.com/2010/04/5249-injunction-sought-by-city-attorney-to-curb
[14] http://www.lapdonline.org/faqs/content_basic_view/9664

1   unlawful activity in the Skid Row neighborhood in order to appeal for more money

2   from their funders.

3       48.    In a subsequent blog post dated September 7, 2007, entitled "Are They

4   Really For You?" Officer Joseph's attacks on LA CAN took a more  sinister  tone. In

5   complete derogation of the truth, Joseph wrote in LAPD's official blog  that LA CAN

6   exploited poverty for funding, its' members sold  knives and cans of beer to homeless

7   people, and distributed pornography on the sidewalks where women and children walk

8   He denigrated the organization's filing of officer complaints as often "false" and as

9   "slander" against LAPD leadership.   He closed by calling his false accusations against

10  LA CAN "truths", and his blog entry as a "letter of truth".  He signed off the blog entry

11  as "From your SLO Deon Joseph, Serial No. 32511."

12      49.    Officer Joseph took the polemic one step further by personally, in uniform,

13  distributing a printed, and more vitriolic, version of his blog entry to Skid Row

14  residents, entitled "Are They Really For You?". The handout accused LA CAN and its

15  members of "pimping poverty for funding" and "poisoning the community". He wrote

16  that, "It angers me that this group truly wants skid row to go right back to where it was

17  before, with people overdosing and slowly dying on the sidewalks, so they can pimp

18  your pain to the Catholic Church, and other donors, without seeing one bit of

19  improvement in your lives." He signed off the handout as "From your Senior Lead

20  Officer Deon Joseph. God Bless and keep you all."

21      50.    LA CAN filed an LAPD misconduct complaint about the blog posts and

22  handouts, which eventually was successful in stopping the handouts. However, they

23  were never formally retracted, and a slightly altered blog post version of "Are They

24  Really For You?" remains on the LAPD blog site to this day.

25      51.    In addition to his written communications, Officer Joseph has repeatedly

26  interfered with private tours conducted by LA CAN. LA CAN organizers often show

27  groups of students, church members, and donors the Skid Row community. During

28

FOURTH AMENDED COMPLAINT

several of these tours, Officer Joseph, acting in his official capacity as LAPD liaison to the community, has accosted the groups being led by LA CAN staff, including Ms. Burton, to say that LA CAN is spreading lies about Skid Row. Officer Joseph often uses the loud speaker on his police car to make derogatory comments about LA CAN, when he sees LA CAN organizers speaking to people in the community or participating in Community Watch. This activity is plainly intended to interfere with LA CAN's ability to recruit members and raise much needed funds.

### D.      Other Arrests and Detentions

52.      In or about 2007 Co-Executive Directors Pete White and Becky Dennison, along with staff member Steve Diaz, heard that business improvement guards were beating a man on a public sidewalk. They went to film the incident and to demand that the beating stop. Dennison and White's efforts were limited entirely to speaking to the private security guards.   LAPD never arrived on scene, and the guards eventually stopped beating the man, who then ran away. Approximately two days later, LAPD officers came to the LA CAN office and demanded to see Becky Dennison's identification. The officers told her that they were investigating an alleged assault by an LA CAN member against a business improvement district guard.  Ms. Dennison and Mr. White discussed the incident briefly with the officer and explained what happened. Later, Mr. White and Ms. Dennison each received a letter from the City Attorney's office accusing them of committing a battery and demanding that they appear at a City Attorney's hearing.  After the hearing no charges were filed.

53.      LAPD has particularly targeted General Dogon, the LA CAN staff member who started the Community Watch program. Dogon joined LA CAN in early 2005 after witnessing a guard violently twist the arm of a woman who the officer suspected had a crack pipe.  The "crack pipe" was in fact only eyeliner.  Because of his Community Watch activity, Dogon is known by many LAPD officers, who harass him both during

FOURTH AMENDED COMPLAINT

1  and after work hours, as he is a Skid Row resident. Police have detained Dogon

2  approximately five times without any charges being filed.

3       54.    Because of the ongoing targeting of Dogon, in 2010 LA CAN and the

4  National Economic and Social Rights Initiative filed an Urgent Appeal to the United

5  Nations' Special Rapporteur on the situation of human rights defenders, and an updated

6  version of the Urgent Appeal was filed in 2011 upon request.  The UN review resulted

7  in a letter of concern issued to the U.S. Government that requested a reply to the

8  allegations within 60 days (Case No. USA 24/2011). As of the June 2012 report to the

9  UN Human Rights Council, no reply was received.

10       55.    On or about April 2, 2013, LAPD officers arrested LA CAN member

11  Wayne Henderson solely because he was videotaping the arrest of an LA CAN member

12  outside LA CAN's office. Mr. Henderson obeyed several orders by police to move

13  back, but they still arrested him, claiming he was interfering with the arrest.  No charges

14  were filed.  During this arrest, General Dogon opened up LA CAN's office space so

15  that other observers on the sidewalk could go inside to avoid being arrested.  Two

16  LAPD officers, including, on information and belief, Sergeant Kenny, followed Dogon

17  and the others inside LA CAN's office. The officers stood near the doorway, one with

18  his hand on his gun, in such a way as to convey to those inside that they were not free to

19  leave. Although they were on LA CAN's private property without probable cause and

20  over the objections of LA CAN staff, the officers refused to leave, claiming they were

21  coming in to "go to the meeting." Only after numerous requests that they leave and after

22  and a substantial delay did they do so.

23       56.    On or about May 22, 2013, LA CAN and supporters, including Ms.

24  Burton, held a protest in front of LAPD headquarters about the wrongful prosecution of

25  LA CAN staff member Deborah Burton.  LA CAN members and supporters intended to

26  also speak against this prosecution in a public meeting of the Police Commission as part

27  of the Commission's standard procedures for hearing from the public.   However, after

28

only a few participants entered the Police Commission hearing room, LAPD officers barred other LA CAN members and supporters from attending this public meeting.  No one other than LA CAN members was excluded.  LAPD officers claimed that there was no more room in the hearing room, though there were many seats available.

57.    After the Police Commission hearing, the same group of LACAN members and supporters, including Ms. Burton, went to City Hall East, which houses the offices of the City Attorney of the City of Los Angeles and is generally open to the public. A small delegation sought to speak to a representative from the City Attorney's office, but were denied access to the lobby of City Hall East by approximately one dozen armed police officers.

58.    After leaving City Hall East on May 22, 2013, LA CAN members and supporters returned to the LA CAN offices on Main Street to resume their planned activities, which included distributing vegetable seedlings to Skid Row residents as a part of LA CAN's Healthy Food Project. Two LA CAN member-interns and another LA CAN volunteer were sitting on folding chairs with their backs to the wall of the LA CAN office building, passing out seedlings to Skid Row residents and educating people about growing and eating healthy foods.  There were numerous other individuals, unrelated to LA CAN, sitting on the sidewalk nearby. Several LAPD officers arrived and, without warning, detained the three LA CAN members. When bystanders asked the officers why the three were being detained, the officers called for back-up.  Shortly thereafter, the LAPD Watch Commander and approximately ten other LAPD officers arrived on the scene.  One of the interns and the one volunteer were cited for sitting on the sidewalk.  None of the non-LA CAN people who had also been sitting on the sidewalk nearby were cited.

59.    LA CAN staff member Thelmy Perez went outside to document these detentions with her cell phone camera.  As she was walking around the officers, LAPD officers arrested her. They claimed she was blocking the sidewalk, which she was not.

FOURTH AMENDED COMPLAINT

1   At the LAPD Central Bureau station, a female LAPD officer patted Ms. Perez down,

2   lifting her breasts and placing her hands between her legs and buttocks while male

3   officers looked on and mocked the pronunciation of her name, making comments such

4   as "tell-me, you want to go to jail?" Police drove Ms. Perez to LAPD's 77th Street

5   Division station, more than seven miles away. Ms. Perez repeatedly asked for the

6   officers to adjust her handcuffs as they were very tight and causing her pain, and

7   requested that they roll down her window as it was extremely hot in the back seat.

8   Officers ignored her requests. When they arrived at the station Ms. Perez was soaked in

9   sweat and her wrists and arm were in pain. Ms. Perez was released from 77th Station.

10  No charges were filed against her. Ms. Perez suffered physical pain, humiliation and

11  extreme anxiety.  This arrest also interfered with her work as an LA CAN staff person

12  and prevented her from witnessing and documenting police activity.

13      60.    Most recently, on June 6, 2014, General Dogon was arrested. Dogon was

14  walking down Spring Street downtown with an LA CAN member, when he noticed an

15  LAPD police officer sitting at a café, staring at him. As he walked by, Dogon asked the

16  officer why he was starring. The officer ran out of the café, chased Dogon and ordered

17  him up against the wall. Dogon refused. The officer then pulled out a taser gun and

18  indicated that he would injure Dogon. Dogon was handcuffed and the officer called for

19  backup indicating that it concerned a robbery. Approximately twelve LAPD officers

20  arrived on the scene, including Seargent Jones, who called Dogon by name and ordered

21  the arrest. Dogon was taken to Central Division and told he was being charged with

22  Penal Code §415 for "challenging the police." While Dogon was in the station, Officer

23  Mejia yelled a profane reference to earlier lawsuit filed by Dogon against LAPD.

24  Dogon remained in custody until his father bailed him out the following afternoon. At a

25  hearing on July 2, 2014, the City Attorney's Office declined to press charges.

26

27      E.    Attack on LA CAN Members at City Hall

28

FOURTH AMENDED COMPLAINT

61.     On or about May 21, 2010, LA CAN members, including Ms. Burton, attended a Los Angeles City Council meeting at which a vote was scheduled to be held regarding a temporary rent-freeze for rent controlled apartments in the city.  Members of at least ten other organizations attended the meeting. After several hours of waiting in very full council chambers, the large group of concerned residents were told that the City Council decided to send the motion back to committee and that there would be no public input.  A spontaneous protest began. A large group of tenant advocates chanted "rent strike now". The Los Angeles General Services police officers, who are routinely at City Council meetings, started moving people out of the council chambers.  People were slowly complying with the orders to leave.  Approximately ten minutes after the protest began; about twenty armed LAPD Central Division police officers entered the chambers and surrounded the area where people were trying to exit. They funneled everyone into the crowded central aisle and started physically pushing people backwards, not allowing time or space for people to safely get to the exit. Members of the public were knocked down, and some were trampled, as LAPD officers continued pushing. LAPD then closed the doors of chambers, sealing approximately fifteen people inside the council chambers.

62.     Several LAPD officers tackled two LA CAN members, who were wearing LA CAN t-shirts, they had sealed inside the council chambers. Without provocation, LAPD officers used a taser on one of them, Gerardo Gomez, to apply a painful high voltage electric shock. The officers arrested Mr. Gomez and held him in custody for three days before he was released from the courthouse with no charges being filed. Another LA CAN member's foot was trampled during the LAPD melee, and he ultimately lost one of his toes as a result.  Mr. Gomez and several other LA CAN members who were injured by police officers in this incident filed a lawsuit against the City, which paid to settle the cases.  Mr. Gomez and some other LA CAN members

1   stopped going to City Hall for up to a year after this event due to extreme fear and

2   anxiety.

3

4   **F.      Unlawful Limitations on First Amendment Activities in Protests and**

5   **         Excessive LAPD Presence**

6          63.      In December, 2011, LA CAN, Ms. Burton and other tenant groups

7   organized a three-day clean up and camp out, called "Reclaim Rampart," at the

8   notorious Rampart Police Station. The purpose was to support the community's calls for

9   the station to be re-dedicated for a community oriented purpose.  After cleaning up the

10  area, they gave away fruits and vegetables, held conversations with residents about

11  what the uses they would most like for the site, and held community education events.

12  On the first night of the event, about twenty people, including several children, were

13  camping on a residential street in back of the old station. LAPD officers appeared and

14  told demonstrators to move to the Temple side of the building.  The group complied. A

15  few hours later, LAPD amassed dozens of officers in riot gear near the Rampart station.

16  LAPD shut down the 101 freeway exit and the street leading to Temple. LAPD

17  Assistant Chief Perez told the group that they must remove all bedrolls and tents, and

18  that no one would be allowed to sleep on the sidewalk near the station at any time.  This

19  order deliberately violated the settlement agreement to which the City had entered in

20  *Jones v. City of Los Angeles*, 505 F.3d 1006 (9th Cir. 2007) (referencing the settlement)

21  that permits people to sleep on sidewalks during nighttime hours.[15] Chief Perez

22  threatened arrest of anyone sleeping, thus forcing the people to remain awake

23  throughout the night.  Many neighborhood residents expressed fear due to the large

24

25  [15] In *Jones*, six homeless individuals filed an Eighth Amendment challenge to the enforcement of a City of Los Angeles ordinance that criminalizes sitting, lying, or sleeping on public streets and sidewalks. Plaintiffs were cited or arrested for violating the ordinance when they were unable to obtain shelter for the night. *Jones v. City of Los Angeles*, 444 F.3d 1118, 1120 (9th Cir. 2006) (opinion later vacated on the parties' motion after settlement of the case).The Ninth Circuit held, *inter alia,* that the ordinance violated the Eighth Amendment. *Id.* at 1138.

28

FOURTH AMENDED COMPLAINT

1   police presence.  LA CAN members, including Ms. Burton, were extremely anxious

2   and frightened, and some left because they were so intimidated by the large police

3   presence.

4       64.    In February 2012, Defendant City started street and sidewalk clean- ups in

5   Skid Row. LA CAN supported these clean-ups, but opposed using them to take people's

6   property.  LA CAN members were present to help homeless individuals move back to

7   their spots on the street after the cleaning and to monitor the handling of personal

8   property. About a dozen LAPD officers refused to let people move their belongings

9   back on the sidewalk on Towne Street after it was "sanitized." In a five minute period, a

10   police officer threatened arrest of LA CAN members for being on the sidewalk, keeping

11   personal property stationary (although it was in rolling carts), inciting the crowd, and

12   not keeping moving. LA CAN members had to form a moving picket line with carts of

13   personal property.

14       65.    In late May and June 2012, LA CAN, including Ms. Burton, began a series

15   of protests against the Central City Association's "Downtown 2020" plan, because it

16   promoted the criminalization of homelessness and policies that would limit or prevent

17   the building of housing for the poor in the downtown area.  As part of a larger

18   community education strategy, LA CAN organized a weeklong "sleep-out" in front of

19   the Central City Association offices.  There were dozens of LAPD police officers

20   regularly on site throughout the several days of protests and "sleep-out,"  and at

21   multiple early morning protests in the weeks that followed.   LAPD officers told LA

22   CAN staff and members, including Ms. Burton that they must remove their tents and

23   signs. After LAPD confiscated a tent with protest signs on it, LA CAN members lifted

24   the tents up off the sidewalk and carried them. An LAPD officer then informed LA

25   CAN that they needed to "pack up and go" because they were a public nuisance, and

26   threatened arrest. LAPD officers ordered LA CAN members to remove a canopy and

27   table holding community education materials. An LAPD officer stated that LA CAN

28

members had one minute to remove all merchandise, personal property, and "cardboard" (protest signs) from the public sidewalk or it would be considered "found property" and confiscated. An LAPD officer then announced they would be commencing street cleaning where the protest was taking place, whereupon a business improvement district guard sprayed water on people who were peacefully picketing. LAPD officers also threatened, arrested or cited numerous protestors for sitting on the sidewalk or for such things as placing a backpack on the sidewalk next to them.

66.     In mid June, 2012, LA CAN members were on site at the Defendant City's "clean up" of Gladys Street and Crocker Streets in Skid Row.  LA CAN had asked for and received permission from LAPD Assistant Chief Paysinger and the Los Angeles Fire Department official in charge to monitor the clean up. However,  LAPD officers told LA CAN members that they could not be on the street and sidewalk even though videos show other members of the public (and press) were on the street and sidewalk for the same purposes, to observe the effort, including  how the personal property of homeless individuals was being handled by employees of the defendant City. LAPD officers threatened LA CAN members with arrest if they didn't monitor from a distance further away than members of the press and general public who were observing.

67.     Over three weeks in November, 2012, the Central City Association held three "Breakfasts with the Mayoral Candidates" at the Orpheum Hotel. LA CAN protested the events to call for more housing for the poor and to let the mayoral candidates that the Central City Association's plan for Downtown did not represent the views or interests of all downtown residents and stakeholders. LAPD's presence grew significantly each week. By the third and last week, LAPD officers were on the scene even before LA CAN even arrived.  An LAPD officer informed LA CAN members, including Ms. Burton, that they could not play drums or make other loud noise, and would be arrested if they did so. LA CAN members put away drums and began singing

1   and chanting quietly. LAPD officers then ordered LA CAN members to be silent or

2   suffer arrest for making excessive noise.

3       68.    The multiple incidents described herein have had a severe and negative

4   impact on LA CAN's abilities to fulfill its mission. LA CAN has lost a number of

5   productive members due to fear of continued police harassment and unprovoked arrests.

6   One is an elderly woman who on multiple times was harassed by Officer Joseph and

7   told not to show up at LA CAN or participate in its activities. Another core member was

8   too afraid to go to City Council to petition government for two years after the May,

9   2010 incident. Others will not exercise their First Amendment rights by participating in

10   protests because of the large LAPD presence and aggressive conduct of its officers at

11   any LA CAN event. Many LA CAN members go about their duties, including

12   Community Watch, with apprehension and fear solely as the result of LAPD's unlawful

13   targeting.

14

15   **G.**    **CCEA Skid Row Walks and the Malicious Prosecution of Deborah**

16          **Burton and LA CAN by all Defendants**

17       69.    In July, 2012, the City Attorney's Office filed criminal charges against

18   plaintiff Deborah Burton, alleging several counts of assault based on events at a protest

19   from over a year earlier.  In July, 2013, a jury found Ms. Burton not guilty on all counts.

20   In fact, there was no truth to any of the accusations, which were made by defendants. In

21   the course of litigating this case, evidence emerged that showed the degree to which

22   defendants were conspiring to target LA CAN, its staff, and members.

23       70.    In 2005, defendants CCEA, Estela Lopez, LAPD personnel, along with

24   Council staff, began an event called the Skid Row Walk ("Walk"). Each month, Ms.

25   Lopez would lead a group of people for a walk around the Skid Row neighborhood,

26   pointing out things that she and her organization perceived to be problems and

27   discussing their proposed solutions to these problems.  While the meeting was promoted

28

FOURTH AMENDED COMPLAINT

as being open to the public, the viewpoints of homeless and low-income members of the community were rarely, if ever, included.  Participants in the Walk usually were business leaders and real estate developers, politicians and government officials, wealthy residents of the area, and representatives from the large institutional homeless shelters. LAPD officers almost always participated in the Walk in large numbers. Defendant BID guards always accompanied the Walk.

71.     Plaintiffs are informed and believe that the real purpose of the Walk was to promote defendants Lopez and CCEA's' anti-homeless agenda, including removing poor and homeless people from Skid Row.  One major goal of the Walk was to mobilize support for the Safer Cities Initiative.  LAPD officers involved in SCI, particularly defendant Paulson, were active participants in the Walk.

72.     Starting on March 2, 2011, LA CAN and other community groups began countering the Walk to protest its gentrification and criminalization agenda.  LA CAN and its partners believed that it was important to give voice to the portion the community that was excluded from the Walk, and that they needed to express to the supporters and implementers of SCI the reality of its harmful impacts.  LA CAN and its allies attended the Walks with signs critical of SCI, CCEA, the police, the Mayor and City government.  They sang and chanted their protests, often supported by drums and whistles, and occasionally other noisemakers.  They engaged in conversation with Walk participants and with those in the surrounding community about their disagreement with the CCEA and City agenda for Skid Row.

73.     City Attorney Carmen Trutanich attended the Walk on April 6, 2011, the night of the second protest, and advised defendant Lopez, according to an e-mail she sent her board of directors, that he "would explore all legal options to protect [CCEA] and allow us to conduct our walk without interference from LA CAN."

74.     On April 28, 2011, Becky Dennison and Pete White, Co-Directors of LA CAN, sent a letter to defendant Lopez and to the Los Angeles Homeless Services

27

Authority (who often had staff participating in the Walk), explaining that they were protesting the Walk because "it supports and promotes the criminalization of homelessness and poverty and is comprised only of those from outside of our community." LA CAN urged Ms. Lopez and the CCEA "to end this condescending and offensive walk through our community." Defendant CCEA responded by demanding that LA CAN stop all protests of the Walk.

75.     Plaintiffs are informed and believe that prior to the June 1, 2011 Walk, defendants formulated a plan to seek to pursue false criminal charges against LA CAN for their protests. Plaintiffs are informed and believe that the plan was discussed by and between, among others, Ms. Lopez, her staff, and LAPD officers, particularly Lt. Paulson.

76.     During the June 1st Walk, a large contingent of community members, led by LA CAN and including Ms. Burton, participated in a protest of the CCEA Skid Row Walk. They held up signs, chanted, and used various noise-makers, including clapping their hands, drumming, sounding toy air-horns and speaking through a mega-phone. The air-horns were generally used in rhythm with the chanting. Periodically, plaintiff Burton, who held an air-horn, raised it above her head, directing the sound over the people in the crowd.

77.     During the protest, defendants Paulson and Lopez were present and in frequent contact with each other. CCEA's lawyer was present, along with his two videographers. At CCEA and Ms. Lopez' direction, the videographers were filming the conduct of LA CAN and other protesters in an effort to document some misconduct on their part. Additionally, a large number of police officers under Lt. Paulson's command and defendant BID guards working for CCEA were present. City Attorney Trutanich arrived during the course of the Walk in apparent support of Ms. Lopez, the CCEA and their agenda. No protester committed any crime. CCEA's videographers documented no crime. No protester was arrested or cited.

78.     That same evening, after the Walk, defendant CCEA's Director of Operations Steve Keyser, a former LAPD Lieutenant, e-mailed defendant Paulson and told her that CCEA would like the LAPD to take criminal enforcement action against LA CAN based on the noise at their protest of the Walk. Lt. Paulson told him that she too would like to pursue criminal charges against LA CAN members, but that the City Attorney's police litigation unit had already advised her that any arrest risked violating their First Amendment rights.

79.     On June 29, 2011, Mr. Keyser e-mailed defendant Paulson again, repeating that CCEA wanted the LAPD to pursue criminal charges against LA CAN, and asking that she meet with him and CCEA's lawyer to come up with a strategy for the next Walk scheduled for July 6, 2011. Plaintiffs are informed and believe that Mr. Keyser's communications were made at Ms. Lopez' direction. Mr. Keyser and Lt. Paulson then formulated a plan to accuse LA CAN members of assault based on their use of air-horns during the June 1 protest. However, Lt. Paulson, in an e-mail, said she was "not sure who to make the victims as of yet." In this email, Lt. Paulson asked Mr. Keyser if he knew a "friendly" doctor who would testify on their behalf regarding the noise at the protests. Mr. Keyser and Ms. Lopez confirmed by e-mail the next day that they supported this plan.

80.     On July 2, 2011 defendant Paulson e-mailed CCEA to say that she was "bound and determined to stack the deck as far as possible" so that the City Attorney would prosecute any LA CAN member against whom they made accusations. In this e-mail, Lt. Paulson colluded with CCEA leadership to create a biased crime report to support their accusations, including asking them for their "permission" to describe the purpose of the Skid Row Walk and offering them the opportunity to "edit or add anything to" the report. The arrest report was designed to portray CCEA and the Walk in a positive light in order "to overcome an argument that [the Skid Row Walk] is just a propaganda/re-gentrification effort," and to de-legitimize the LA CAN protest.

81.     This July 2, 2011 e-mail acknowledged that, though they were determined to accuse LA CAN members of assaults with air-horns, they needed to identify more people, "other than the Asst. Director at the Midnight [Mission]...who can articulate discomfort due to the air horns." In her report, written not long after this e-mail was sent, defendant Paulson falsely claimed to have witnessed plaintiff Deborah Burton walk up to Mai Lee, the assistant director at the Midnight Mission, and sound the air-horn directly in her ear from a distance of less than one foot. This claim formed the basis of one of the assault charges later filed against Ms. Burton. However, video taken by CCEA videographers, and reviewed by Lt. Paulson prior to submitting the report for filing, definitively contradicted this claim, instead showing that Ms. Burton sounded the horn up in the air and not in Ms. Lee's ear. The video also showed that Ms. Burton was no closer than eight feet from Ms. Lee at the time she sounded the air-horn. Lt. Paulson also falsely claimed in the same report, that Ms. Burton had sounded her air-horn from point blank range into Mr. Keyser's ear. However, the CCEA video again disproved this false assertion, showing instead that Ms. Burton sounded the air-horn into the air as Mr. Keyser was at least fifteen feet away from her and walking away. Lt. Paulson included both of these false claims in her report, despite having viewed the videotapes that disprove them.

82.     On July 1, 2011, defendant Paulson contacted the Los Angeles City Attorney's office to lobby them to file charges against LA CAN members whom she intended to arrest at the upcoming July 6, 2011 protests. Lt. Paulson claimed to have video showing assaults with air-horns, though no such evidence existed, as no assaults occurred.

83.     On July 2, 2011, defendant Paulson informed defendant Lopez and Mr. Keyser that she intended to contact allies of CCEA who were present at the recent protests to find out who would be willing to be listed as a victim or witness to LA CAN's purported criminal actions. On July 5, 2011, the day before the next protest, Ms.

Lopez and Mr. Keyser met with the Lt. Paulson to further discuss pursuing criminal prosecution against LA CAN and its members.  At this meeting, Ms. Lopez claimed discomfort in her ear due to the general noise from the June 1, 2011 protest, but did not make any specific accusation against any one person, nor claim that the discomfort resulted specifically from an air-horn.

84.     On July 6, 2011, defendant Paulson e-mailed to a list of CCEA supporters asking if they would be willing to be listed as witnesses or victims on a crime report regarding LA CAN's protest.

85.     On July 6, 2011, defendant LAPD held a videotaped briefing prior to that evening's Walk.  Lt. Paulson outlined the LAPD tactical plan for the Walk and distributed pictures of LA CAN staff and organizers on whom she wanted officers to focus. These included pictures of Deborah Burton, Eric Ares, Becky Dennison, Steve Diaz and Hamid Khan, all LA CAN staff.  Lt. Paulson instructed the officers to avoid arresting people on busy streets, suggesting other locations such as Gladys Street.

86.     During the Walk on July 6, 2011, there was a large LAPD presence.  LA CAN co-Executive Director Pete White was videotaping the Walk. As the Walk neared the corner of Fifth and Gladys Streets, Lt. Paulson arrested him.  After the arrest Lt. Paulson spoke to Ms. Dennison and informed her that she had "no right" to send the April 28, 2011 letter criticizing the walk to the City Attorney and CCEA.  LAPD released Mr. White that night with a citation to appear in criminal court.  However, no charges were filed.

87.     Over the next several months, defendant Lopez met with high level officials at the City Attorney's office in order to pressure them to file criminal charges against LA CAN members for protesting the Walk.  Defendants LAPD and Paulson supported defendant CCEA's efforts to pressure the City Attorney to file charges, including personally delivering the arrest report and videos to the City Attorney's office "in an effort to convey its importance."  Lt. Paulson said in an e-mail that, although the

situation appears to be "merely a 'technical violation' of the law," she would "place the full resources of my 50-officer task force at the disposal of your office should any leg work or additional effort be necessary to find some legal, prosecutorial remedy to this."

88.     In the fall of 2011, the City Attorney declined to file charges against Mr. White of LA CAN for his conduct at the July 6, 2011 protest. They had no basis to believe that he had committed any crime. On November 8, 2011, the City Attorney's office contacted defendant Paulson and indicated that she needed to conduct further investigations if they were to bring a case against any LA CAN members. At this point, Lt. Paulson focused on plaintiff Deborah Burton and her use of the air-horn during the June 1, 2011 protest. On November 10, 2011, Ms. Lopez met with Lt. Paulson and claimed, for the first time, more than five months after the incident, that Ms. Burton had attacked her with an air-horn, by sounding it directly in her ear at point blank range.

89.     Defendant Lopez claimed to have suffered serious ear trauma, including significant hearing loss, pain and constant ringing in her ears, caused by Ms. Burton's action. However, she had not had an ear doctor check her ears until over two months after the supposed injury occurred. The doctor did find some hearing loss in her right ear, and noted Ms. Lopez' subjective claims of ringing in her ears. Lt. Paulson documented the claimed ear injury in her reports. However, Lt. Paulson did not document that Ms. Lopez had an over thirty year history of ear troubles, including recurring hearing loss in that same ear and a diagnosis of Menieres disease or a condition called Cochlear Hydrops, also in that same ear, which can cause hearing loss. This alleged injury became the basis for a criminal charge of assault causing serious bodily (California Penal Code section 243(d)) against Ms. Burton.

90.     On June 29, 2012, defendant Lopez emailed Deputy City Attorney Brad Rothenberg and informed him that she would bring him the "unedited" video that shows Ms. Burton blowing the air horn in her ear. No video exists that shows Ms. Burton sounding an air-horn in Ms. Lopez' ear.

91.     On July 23, 2012, more than one year after the June 1, 2011 Walk, the City Attorney's office filed assault charges against Ms. Burton, for crimes they claimed she committed that day with the toy air-horn. They charged two counts of assault likely to cause great bodily injury (Penal Code section 245(a)(4)) and one count of battery causing serious injury (Penal Code section 242-243(d)).

92.     Ms. Burton learned of these charges in August, 2012, when an LAPD officer approached her while she was on Community Watch, and told her that there was a warrant out for her arrest and that he would arrest her next time he saw her. In fact, there was no warrant. This threat caused Ms. Burton great fear and anxiety and interfered with her ability to work as an organizer.

93.     On August 9, 2012, in response to a press release issued by the City Attorney or Ms. Lopez, or possibly by both, the Downtown News printed an article publicizing Ms. Lopez and Lt. Paulson's false accusations against Ms. Burton.

94.     On August 22, 2012, Ms. Burton appeared in Los Angeles Superior Court to face the criminal charges. She was terrified and anxious about the possibility that she might serve jail time based on these false allegations, and about the damage to her reputation.  From the date of her arraignment until the resolution of the charges, Ms. Burton had trouble sleeping and felt constantly nervous.  Her ability to work suffered, as did her relationships with family, friends and co-workers.  She suffered physical and psychological harm and damage to her health because of the stress of defending herself from these accusations.

95.     On June 28, 2013, Deborah Burton's criminal trial began in the Superior Court in Norwalk before Judge Patrick Meiers.  On July 11, 2013, the jury returned a verdict of not guilty on all counts, including the lesser included offenses of three counts of simple assault and one count of battery.

**COMPLAINTS BY PLAINTIFFS TO CITY OFFICIALS**

96.     Plaintiff LA CAN and its members have, for several years, complained numerous times to the City and the LAPD about the constant interference with their First Amendment activities. Those complaints were either ignored or met with a token response. The complaints, some of which are described below, have not led to a change in the City's and LAPD's response to LA CAN's protected activities.

97.     On April 10, 2007, members of LA CAN spoke at a Police Commission meeting complaining about Officer Joseph passing out slanderous materials about LA CAN. Chief Beck and or Assistant Chief Earl Paysinger is generally at each Police Commission meeting. In 2009 and before that, Chief William Bratton regularly attended Commission meetings.

98.     On February 12, 2008, LA CAN wrote letters to then Mayor Villaraigosa, members of the City Council and the Police Commission about the enforcement actions taken against LA CAN and the arrest of co-director Pete White.

99.     On March 14, 2008, LA CAN co-director Becky Dennison filed an LAPD Misconduct Complaint against Officer Joseph. LAPD responded with a standard letter stating that the complaint was classified as non-disciplinary.

100.    On November 18, 2008, LA CAN spoke before the Police Commission about Officer Joseph's activities and the cost to LA CAN of opposing the Safer Cities Initiative during a time of expanded harassment of Community Watch teams.

101.    On January 15, 2009, LA CAN met with Deputy Mayor Larry Frank from the Mayor's Office to complain about the harassment of its organizers.

102.    On March 11, 2009, LA CAN filed a complaint with the US Department of Justice complaining about the harassment of its organizers and members by the LAPD.

103.    On April 6, 2009, LA CAN met with Captain Chow of the LAPD to discuss the targeting and harassment of organizers.

104.   On July 6, 2011, Becky Dennison filed a written misconduct complaint with LAPD complaining about Lt. Paulson and violations of the First Amendment. The LAPD response was that the complaint was "unfounded".

105.   On May 2, 2012, LA CAN attended a private meeting with Captain Frank regarding problems experienced by LA CAN members during the Skid Row Walks.

106.   On May 22, 2013, LA CAN wrote a letter to the City Attorney's office regarding both the Deborah Burton prosecution and the criminalization of legal protest during the Skid Row Walks. That letter was submitted in follow up to a face-to-face meeting in the City Hall East lobby two days earlier.

107.   In or about May 2013, LA CAN staff met privately with Deputy Chief Perez and Richard Tefank of the Police Commission to discuss, among other things, the targeting of organizers in Skid Row.

108.   On June 20, 2013, plaintiffs submitted letters of complaint and a Petition at a Town Hall Meeting attended by City Attorney-Elect Mike Feuer protesting criminalization of legal protest activities. LA CAN staff Thelmy Perez also provided similar testimony at that Town Hall.

109.   On June 25, 2013, LA CAN submitted a letter and petitions to the office of then City Attorney Trutanich complaining about treatment of Deborah Burton and protesters.

110.   On June 28, 2013, LA CAN staff filed a Misconduct Complaint with the LAPD regarding the investigation and arrest of Deborah Burton.

111.   On August 20, 2013, LA CAN's Board Chair wrote a letter to City Attorney Mike Feuer complaining about the criminalization and targeting of LA CAN in response to the organization's First Amendment activity.

112.   In September 2013, LA CAN representatives along with their attorney met with City Attorney Feuer to discuss the prosecution of Deborah Burton and the targeting of LA CAN by the City.

113.   On October 8, 2013, LA CAN provided testimony at a public meeting of the Police Commission, again regarding the mistreatment of LA CAN staff and members by the LAPD.

## COMPLIANCE WITH TORT CLAIMS ACT

114.   On December 18, 2013, plaintiff Burton filed a claim for damages with the City of Los Angeles, claim number C14-2453. On January 7, 2014 the City Attorney's Office denied the claim.

## FIRST CLAIM FOR RELIEF
## FREEDOM OF SPEECH AND ASSOCIATION
### (42 U.S.C. §1983 – 1st Amendment)
### (By All Plaintiffs Against Public Defendants Only)

115.   Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to CANGRESS' claims are contained at paragraphs 40-113. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to Burton's claims are contained at paragraphs 1-, 42, 51, 56-58, 61-63, 65, 67, 69-95, and 96-113.

116.   Defendants, all state actors or acting under color of state law, owed plaintiffs a duty under the First Amendments to the U.S. Constitution to permit plaintiffs free exercise of free speech and association.

117.   The policies and actions of the defendants, as set forth above, intended to disrupt, misdirect, discredit or otherwise neutralize and suppress, punish and chill plaintiffs' protected activities.

118.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered, and continue to suffer harm. For Deborah Burton, her damages

include, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress. For LA CAN, its injuries include, but are not limited to, frustration of mission and diversion of resources.

119.   Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
## RETALIATION
### (42 U.S.C. §1983 – 1st Amendment)
### (By All Plaintiffs Against All Defendants)

120.   Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to CANGRESS' claims are contained at paragraphs 40-113. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to Burton's claims are contained at paragraphs 1-, 42, 51, 56-58, 61-63, 65, 67, 69-95, and 96-113.

121.   Defendants, all state actors or acting under color of state law, had a duty under the First Amendment of the U.S. Constitution to permit plaintiffs free exercise of their First Amendment rights.

122.   When plaintiffs exercised these rights, defendants retaliated, or conspired to retaliate against plaintiffs in the manner alleged herein for participation in what defendants knew or should have known was First Amendment protected activity.

123.   As a proximate result of defendants' wrongful conduct, plaintiff Burton suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress. For LA CAN, its injuries include, but are not limited to, frustration of mission and diversion of resources.

124.   Plaintiffs are informed and believe, and thereon allege, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

## MALICIOUS PROSECUTION

### (42 U.S.C. §1983)

### (By Plaintiff Deborah Burton Against All Defendants)

125.   Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to Burton's claim under this cause of action is contained at paragraphs 69-95.

126.   Defendants' criminal prosecution of plaintiff Burton resulted in an acquittal of all charges.

127.   Defendants prosecuted Burton with malice and without probable cause.

128.   Defendants prosecuted plaintiff Burton for the purpose of denying her right secured under the First, Fourth and Fourteenth Amendments.

129.   As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

## FOURTH CLAIM FOR RELIEF

## MALICIOUS PROSECUTION

### (California State Law)

### (By Plaintiff Deborah Burton Against Private Defendants)

130.   Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39,

FOURTH AMENDED COMPLAINT

the factual allegations relevant to Burton's claim under this cause of action is contained at paragraphs 69-95.

131.   Defendants' criminal prosecution of plaintiff Burton resulted in an acquittal of all charges.

132.   Defendants prosecuted Burton with malice and without probable cause.

133.   As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

**FIFTH CLAIM FOR RELIEF**

**THREATS, INTIMIDATION OR COERCION**

**(Civil Code §52.1)**

**(By Plaintiff Deborah Burton Against All Defendants)**

134.   Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to Burton's claim under this cause of action is contained at paragraphs 69-95.

135.   Defendants by their conduct interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with the exercise or enjoyment of plaintiff's rights as secured by the First, Fourth and Fourteenth Amendments to the United States Constitution or laws of the United States, [and of the rights secured by the Constitution or laws of the state of California, including but not limited to California Constitution Article I, sections 1, 2, 7 and 13].

136.   As a proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm, in an amount totaling no less than $4,000 for every violation.

FOURTH AMENDED COMPLAINT

137.   Plaintiff is informed and believes, and thereon alleges, that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Deborah Burton Against Private Defendants)

138.   Plaintiff hereby realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint. Specifically, apart from the general allegations contained at paragraphs 1 through 39, the factual allegations relevant to Burton's claim under this cause of action is contained at paragraphs 69-95.

139.   Defendants' conduct as described above was so extreme that it exceeded all possible bounds of decency and was so outrageous that any reasonable person would regard it as intolerable.  Defendants abused their authority to give them real and apparent power to affect the plaintiff's interests.

140.   In engaging in the conduct, defendants intended to cause such emotional distress and/or acted with reckless disregard for the probability that plaintiff would suffer emotional distress from their conduct.

141.   As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered, and continues to suffer harm including, but are not limited to, physical injury, mental anguish, fear, anxiety, humiliation and emotional distress.

## PRAYER FOR RELIEF

Wherefore, plaintiffs seek judgment as follows:

142.   A preliminary and permanent injunction  enjoining defendants, their officers, agents and employees from interfering with plaintiffs' constitutionally protected rights;

143.   For a declaration that defendants' past, present and threatened future actions violate plaintiffs' civil and constitutional rights;

144.   Compensatory, general and special damages in an amount according to proof and as permitted by law;

145.   Damages under federal law for both plaintiffs;

146.   Damages under state law for plaintiff Deborah Burton;

147.   For punitive damages against defendants, including those sued in their individual capacity;

148.   Attorneys' fees and costs as provided for by 42 U.S.C. §1988, C.C.P. §1021.5, and all applicable provisions of law;

149.   Costs of suit; and

150.   Such other relief as the Court finds just and proper.


Dated:  February 17, 2015                    Respectfully submitted,
                                             Legal Aid Foundation of Los Angeles
                                             Hadsell Stormer & Renick LLP
                                             Law Office of John L. Raphling



By:   _____
      Paul J. Estuar

FOURTH AMENDED COMPLAINT